[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10985

_____

D.C. Docket No. 1:14-cv-20708-DPG

UNDERWRITERS AT LLOYDS SUBSCRIBING TO
COVER NOTE B0753PC1308275000,

                                        Plaintiff - Appellee,

versus

EXPEDITORS KOREA LTD.,
FORWARD AIR, INC.,

                                        Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 16, 2018)

Before JORDAN and JILL PRYOR, Circuit Judges, and PROCTOR,[*] District
Judge.

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of
Alabama, sitting by designation.

JILL PRYOR, Circuit Judge:

Expeditors Korea Ltd. and Forward Air, Inc. (together, the "transporters") damaged cargo that they were responsible for transporting internationally.  In this case, the Underwriters at Lloyds ("Lloyds"), having compensated its insured—the cargo's owner—for the damage to the cargo, seeks to recover from the transporters.  The transporters admit their liability; the only question is how much they owe.  Lloyds and the transporters disagree over the rules that govern the amount the transporters must pay.  There are two possibilities: (1) the Montreal Convention,[1] a multinational treaty that provides uniform rules for liability in international air carriage, or (2) the waybill, the contract between the transporters and the company that shipped the cargo.  The Convention and the waybill establish nearly identical limitations of liability, in each case capping damages based on the weight of the damaged shipment.  The only potential difference, for our purposes, is that when damage to one part of a shipment renders the rest of the shipment less valuable, the Montreal Convention calculates liability based on the weight of the entire shipment, while the waybill is ambiguous about whether the weight of the damaged part alone should be used.  Because the transporters damaged one part of a machine that could not operate without the damaged part, the extent of the transporters' liability may depend on whether the Montreal Convention or the

---

[1] Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, T.I.A.S. No. 13038.

2

waybill controls.  We therefore must address whether the Montreal Convention applies under the circumstances present here:  After the cargo had been flown from South Korea to Miami, Florida, en route to Orlando, Florida, it was damaged either at a trucking company's warehouse outside Miami International Airport or while aboard a truck bound for Orlando.

We hold that the district court erred in ruling that the Montreal Convention governs the transporters' liability.  The Convention does not apply based on the district court's factual findings regarding where the cargo was damaged.  By default, then, the waybill governs the transporters' liability.  Because the waybill is ambiguous about the weight that should be used to calculate liability, we remand the case for the district court to address the issue in the first instance.

## I.  BACKGROUND

### A.    The Montreal Convention

We begin with a brief overview of the relevant provisions of the Montreal Convention.  The Convention, which was ratified by both the United States and South Korea, caps a carrier's liability for cargo damaged during international air transport. *See Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1308 (11th Cir. 2010).  The Convention's Article 22 limits a carrier's potential liability

3

to 19 Special Drawing Rights (SDRs) per kilogram of cargo shipped.[2]  *See* Montreal Convention art. 22(3).  "An SDR is an artificial currency, published daily by the International Monetary Fund, which fluctuates based on the global currency market."  *Eli Lilly*, 615 F.3d at 1308.  Central to the dispute in this case, Article 22 provides that if only part of the cargo is damaged, then only the weight of the damaged package or packages is used to calculate liability, but if damage to some packages affects the value of other, undamaged packages, then the weight of the undamaged packages will also be included in the calculation.  *See* Montreal Convention art. 22(4).

The Convention, and thus Article 22's limitation of liability, applies only to cargo damaged during "carriage by air."  *Id.* art. 18(1).  Article 18 defines carriage by air as "the period during which the cargo is in the charge of the carrier."  *Id.* art. 18(3).  The fourth paragraph of Article 18 expressly excludes from that definition "any carriage by land, by sea or by inland waterway performed outside an airport." But there are two exceptions to this exclusion that extend the reach of "carriage by air."  First, the Montreal Convention establishes a rebuttable presumption that cargo damaged at an unknown point during a journey that includes at least some carriage by air will be governed by the Convention.  *See id.* art. 18(4).  Second, if a

---

[2] Article 22 specifies 17 SDRs as the limit, Montreal Convention art. 22(3), but the Convention allows for periodic reassessment of the limit.  *See id.* art. 24.  After reassessment, the current limit for cargo is 19 SDRs.  *See* 74 Fed. Reg. 59017-03 (Nov. 16, 2009).

4

carrier substitutes non-air carriage for air carriage without the permission of the sender, the Convention deems the non-air carriage to have been carriage by air. *See id.* It is plain, then, that the Convention reaches further than literal air transit, but how much further depends on the interplay between paragraphs three and four of Article 18. We examine Article 18 in greater detail below.

## B.    The Waybill

In this case, if the Montreal Convention does not apply, then the waybill under which the cargo was shipped governs the transporters' liability. A waybill is "[a] document acknowledging the receipt of goods by a carrier . . . and the contract for the transportation of those goods." *Waybill*, Black's Law Dictionary (10th ed. 2014). Here, the waybill Expeditors issued provided for airport-to-airport transportation of the cargo from Incheon, South Korea, to Orlando, Florida.[3]

The waybill capped the carrier's liability for damage to cargo at the same amount as the Montreal Convention, 19 SDRs per kilogram. Like the Convention, the waybill also provided that the weight used to calculate damages was to be the same weight that was used to calculate the shipping charges. The waybill described what would happen if only part of the shipment was damaged:

> In any case of loss, damage, to, or delay to part of the cargo, the weight to be taken into account in determining Expeditors' limit of

---

[3] Expeditors was hired to transport the cargo from airport to airport. It in turn hired Forward Air to complete one leg of the journey.

5

liability shall be only the weight of the package or packages concerned.

Air Waybill ¶ 6 (Doc. 78-3).[4]  The parties disagree about whether the waybill's reference to "package or packages concerned" indicates that only the weight of packages actually lost, damaged, or delayed may be considered or whether the weight of packages that diminished in value due to the loss, damage, or delay of related packages may also be included in calculating the carrier's liability.

The waybill contained one other term that is relevant here.  The waybill gave Expeditors the right to substitute non-air carriage for air carriage, absent specific instructions to the contrary.

## C.    The Shipment

TriQuint Semiconductor, Inc., a manufacturer of components used in electronics, purchased a machine for coating silicon wafers from Cybortrack Solutions Inc., a South Korean company.  The machine consisted of various process stations where the wafers were prepared and a robotic arm that moved the wafers among these process stations.  Cybortrack hired Expeditors to transport the machine to TriQuint in ten separate shipping crates from Incheon, South Korea to Orlando, Florida.

Even though the waybill provided for airport-to-airport transportation between the two cities, Expeditors did not fly the ten crates directly from Incheon

---

[4] Citations to "Doc. #" refer to docket entries in the district court record in this case.

to Orlando. Instead, it flew them to Miami and then arranged for a multi-step journey by land to Orlando. After the crates arrived in Miami, a cargo handling company delivered them from Miami International Airport to Expeditors' warehouse near the airport. Expeditors then hired Forward Air to drive the crates by truck to Forward Air's Orlando facility. Along the way, Forward Air stored the crates for a short period of time in its Miami warehouse. Finally, Expeditors hired Crazy Joe's Airfreight to transport the crates by truck from Forward Air's Orlando facility to TriQuint's delivery agent.

Unfortunately, the machine was damaged somewhere between Miami and Orlando. Forward Air employees noted no damage to the crates when they arrived at Forward Air's Miami warehouse. And the company's policy was to decline shipments of damaged items. When the crates arrived at Forward Air's Orlando facility, a Forward Air employee reported that two of the crates were damaged, one of them severely. The severely damaged crate contained the silicon coating machine's robotic arm. The Forward Air employee testified that the crate containing the robotic arm had been crushed either while it was being loaded onto the truck at Forward Air's Miami facility or while traveling in the truck from Miami to Orlando, as a result of improper loading. Upon picking the crates up from Forward Air's Orlando facility, a driver for Crazy Joe's observed that one crate had a hole in it and two crates were missing legs. A Forward Air supervisor

7

also observed the damage when the crates were picked up by the Crazy Joe's driver.[5]

By the time it reached TriQuint, the robotic arm was damaged beyond use.[6] TriQuint received no replacement arm for approximately five months, and the rest of the machine was inoperable without the arm.  The company filed a claim with its insurer, Lloyds, which paid it $918,000 in compensation for the damage.

**D.    Procedural History**

Lloyds then filed this action against Expeditors and Forward Air in federal district court, alleging that in damaging the cargo Expeditors breached its duties under the Montreal Convention, Forward Air was negligent, and both defendants breached the waybill.  Lloyds sought $920,000 in damages.[7]  After discovery, the transporters moved for partial summary judgment, arguing that the Montreal Convention did not apply and that the waybill capped their liability.  The district court denied the motion and then held a bench trial.

After trial, the court entered findings of fact and conclusions of law, determining that the Montreal Convention governed the transporters' liability.  The court found that TriQuint's machine was damaged either while in the custody of

---

[5] Thus, it is clear that, notwithstanding its name, Crazy Joe's could not have been responsible for the damage to the cargo.

[6] The contents of the other damaged crate apparently suffered no harm.

[7] This amount represented the full cost of replacing the damaged unit, along with freight, set up, and other related costs, minus credit for the sale of the damaged unit.

Forward Air at its warehouse facility in Miami or in transit to its Orlando facility. The court also found that Forward Air was acting as an agent of Expeditors while the cargo was in its custody. After examining the text of the Montreal Convention, the court concluded that the damage occurred during carriage by air, and so the Convention applied. Applying the Convention's limitation of liability, the court entered judgment in favor of Lloyds against the transporters in the amount of $195,882 (plus interest).[8] The court calculated the transporters' liability based on the weight of the entire shipment, not merely the crate containing the damaged robotic arm.

The transporters filed a motion to alter judgment and for additional findings under Federal Rules of Civil Procedure 59 and 52, respectively, arguing that the district court had misapplied the Montreal Convention. The district court denied the motion. This appeal—from both the judgment and the denial of the post-trial motion—followed. The transporters do not contest their liability to Lloyds or the amount that Lloyds paid to TriQuint; this appeal concerns only the limitation of liability that governs the calculation of damages.

---

[8] Expeditors also filed third-party claims for indemnity and contribution against All-American Crating, Inc., which had acted as TriQuint's delivery agent. The district court entered judgment in All-American's favor, and Expeditors does not challenge that judgment on appeal.

9

## II.  STANDARD OF REVIEW

Following a bench trial, we review a district court's conclusions of law *de novo* and its findings of fact for clear error.  *Wexler v. Anderson*, 452 F.3d 1226, 1230 (11th Cir. 2006).  With regard to the Montreal Convention, the interpretation of a treaty is a question of law we review *de novo*.  *United States v. Duboc*, 694 F.3d 1223, 1229 n.7 (11th Cir. 2012).  "The goal of treaty interpretation is to determine the actual intention of the parties 'because it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.'"  *In re Comm'rs Subpoenas*, 325 F.3d 1287, 1294 (11th Cir. 2003) (quoting *Air France v. Saks*, 470 U.S. 392, 399 (1985)), *abrogated in part by In re Clerici*, 481 F.3d 1324, 1333 n.12 (11th Cir. 2007).

With regard to the waybill, "[c]ontract interpretation is generally a question of law."  *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995).  The question of whether a contract is ambiguous is a question of law that we review *de novo*.  *Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program*, 129 F.3d 581, 584-85 (11th Cir. 1997).  But "[q]uestions of fact arise . . . when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent . . . to interpret the disputed term."  *Lawyers Title*, 52 F.3d at 1580.

10

## III.    DISCUSSION

We now turn to the question that brings the parties before us: how much of the money that Lloyds paid TriQuint for the damaged machine can be recovered from the transporters?  The amount of the transporters' liability may depend on whether the Montreal Convention or the waybill controls.  Both the Convention and the waybill cap the transporters' liability at 19 SDRs multiplied by the weight of the damaged cargo, but they may differ as to whether the weight of the undamaged parts of the shipment rendered less valuable by the damage to the robotic arm should be included as cargo.

The district court applied the Montreal Convention, but we conclude, based on the district court's own factual findings, that it should have looked to the waybill instead.  Below, we interpret the provisions of the Montreal Convention dealing with damage to cargo and apply them to the facts as found by the district court.  Because the Convention is inapplicable under these facts, the waybill governs the transporters' liability.  We conclude that the waybill is ambiguous about whether damages must be calculated using only the weight of the one crate containing the robotic arm or using the weight of all the cargo that diminished in value due to the damage to the arm.  We thus remand to the district court for further findings of fact to resolve this ambiguity.

11

**A.    The Montreal Convention Does Not Govern the Damages at Issue.**

The issue is whether, under the facts of this case, the cargo was damaged in such a way that the Montreal Convention applies.  This issue turns on our interpretation of Article 18, which defines when the terms of the Montreal Convention govern.  In construing Article 18, our "analysis must begin . . . with the text of the treaty and the context in which the written words are used."  *Air France*, 470 U.S. at 397.  If the treaty contains "difficult or ambiguous passages," we may go beyond the text of the treaty to consider general rules of construction as well as "the history of the treaty, the negotiations, and the practical construction adopted by the parties."  *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991) (internal quotation marks omitted); *see Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217, 226 (1996) (explaining that "a treaty ratified by the United States is not only the law of this land but also an agreement among sovereign powers" and thus "we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux préparatoires*) and postratification understanding of the contracting parties").  Applying this framework, we conclude that the Montreal Convention does not apply in this case because the district court's findings tell us that the cargo was damaged during carriage by land rather than during carriage by air.

12

Article 18 establishes the conditions under which the Montreal Convention will govern liability for damaged cargo. Three of its four paragraphs are relevant here. The first paragraph limits the Convention's reach to damage that takes place during carriage by air:

> 1.    The carrier is liable for damage sustained in the event of the destruction or loss of, or damage to, cargo upon condition only that the event which caused the damage so sustained took place during carriage by air.

Montreal Convention art. 18(1).

The third and fourth paragraphs then set forth when carriage by air occurs. The third paragraph broadly defines "carriage by air" by creating a default rule that any time when the cargo is in the carrier's control qualifies as carriage by air:

> 3.    The carriage by air within the meaning of paragraph 1 of this Article comprises the period during which the cargo is in the charge of the carrier.

*Id.* art. 18(3). Importantly, this paragraph neither restricts carriage by air to the time when the cargo is actually aboard an airplane nor limits it geographically, such as confining it to within an airport. We note that if the Convention was intended to apply only when the damage occurred aboard an aircraft, this paragraph would be wholly unnecessary.

The fourth paragraph of Article 18 refines the definition of carriage by air by excluding certain periods when the cargo is control of the carrier. Initially, it

13

carves out from the definition of carriage by air most non-air transportation performed outside an airport:

> 4.    The period of the carriage by air does not extend to any carriage by land, by sea or by inland waterway performed outside an airport.

*Id.* art. 18(4). We will refer to this first sentence as "the exclusion." Under the exclusion, no period of a journey can qualify as both carriage by air and carriage by land. Beyond drawing this distinction, Article 18 does not define "carriage by land."

After the exclusion, the fourth paragraph establishes two exceptions to the exclusion. If the conditions of either exception are satisfied, the carriage is deemed to have been carriage by air notwithstanding the exclusion. The first exception applies when damage occurs at an unknown point during a journey consisting of both air carriage and non-air carriage that falls within the exclusion. This exception establishes a rebuttable presumption that the cargo was damaged during carriage by air unless there is proof that the damage occurred during carriage by land:

> If, however, such carriage[9] takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air.

---

[9] This sentence immediately follows the exclusion. "Such carriage" therefore refers to "carriage by land, by sea or by inland waterway performed outside an airport." Montreal Convention art. 18(4).

14

*Id.* When it is proven that the damage did *not* occur during carriage by air, the Convention will not apply. *Id.*; *see Danner v. Int'l Freight Sys. of Wash., LLC*, No. ELH–09–3139, 2013 WL 78101, at \*21 (D. Md. Jan. 4, 2013) (reading paragraph four as "establish[ing] a rebuttable presumption"); *see also Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1194 n.2 (9th Cir. 1999) (same in the Warsaw Convention context);[10] *UPS Pty. Ltd. v Gountounas and Another* (2001) 80 SASR 288, 292 (S. Ct. S. Austl.) (same).[11]

The second exception to the exclusion applies when a carrier substitutes carriage by another mode of transportation for carriage by air without the consent of the customer (the "consignor")[12]:

---

[10] The Montreal Convention was modeled on and replaced the Warsaw Convention. To the extent that the terms of Article 18 are similar to the terms of the Warsaw Convention, we may look to the extensive body of Warsaw Convention case law as persuasive authority in interpreting the Montreal Convention. *See Narayanan v. British Airways*, 747 F.3d 1125, 1127 n.2 (9th Cir. 2014); *see also Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1176–77 (11th Cir. 2014) (looking to the Warsaw Convention's drafting history for guidance in interpreting the Montreal Convention).

[11] Treatises on the Montreal Convention and on international transportation law are in agreement that this sentence of Article 18(4) creates a rebuttable presumption that damage to cargo occurred during carriage by air. *See Montreal Convention* ch. III, art. 18, para. 92 (Elmar Giemulla & Ronald Schmid, eds., 2006) (explaining that the "presumption is rebuttable and does not apply if proof exists that the damage was caused during surface transportation outside the airport").

[12] The consignor is "[t]he person named in a bill as the person from whom goods have been received for shipment." *Consignor*, Black's Law Dictionary (10th ed. 2014). In other words, the consignor is the person who shipped the cargo. Here, the waybill specified that the "Shipper" was "CYBORTRACK SOLUTION INC," the company that sold TriQuint the silicon coating machine. Air Waybill (Doc. 78-3).

15

> If a carrier, without the consent of the consignor, substitutes carriage by another mode of transport for the whole or part of a carriage intended by the agreement between the parties to be carriage by air, such carriage by another mode of transport is deemed to be within the period of carriage by air.

*Id.* We will refer to this as second exception as "the substitution exception."

Article 18's definition, exclusion, and exceptions can be represented by the following decision tree:[13]

---

[13] Paragraph two in Article 18 enumerates four other exceptions that we do not include in the decision tree because they are not relevant to this case. *See* Montreal Convention art. 18(2).



Montreal Convention Article 18

To summarize, the Convention creates a default rule that when cargo is damaged during a journey that involves both carriage by air and carriage by land, the Convention's limitations of liability will apply unless it is proven that the damage to the cargo occurred during a period of carriage by land. And even if it is shown that the damage occurred during carriage by land, the Convention will still

govern if the carrier substituted land transport for air transport without the customer's consent.

    1.    <u>We Assume for Purposes of Our Analysis That the Robotic Arm Was Damaged in the "Charge of the Carrier."</u>

In analyzing whether the Montreal Convention governs liability, we assume (but need not decide) that TriQuint's machine was damaged while in the charge of the carrier, Expeditors. As explained above, the Montreal Convention applies only when cargo is damaged during "carriage by air," Montreal Convention art. 18(1), which is defined as "the period during which the cargo is in the charge of the carrier." *Id.* art. 18(3). The transporters argue on appeal that the cargo was in the charge of Forward Air, not Expeditors, the carrier, when the cargo was damaged. The district court determined, however, that Forward Air was an agent of Expeditors acting pursuant to Expeditors' contract of carriage. The transporters challenge the district court's agency finding, arguing that Forward Air was an independent contractor. We doubt that the agent/independent contractor distinction is a salient one under the Convention.[14] But we need not resolve this

---

[14] Numerous Warsaw Convention cases extended a carrier's liability to independent contractors acting in furtherance of the contract of carriage. *See, e.g.*, *McCaskey v. Cont'l Airlines, Inc.*, 159 F. Supp. 2d 562, 580 (S.D. Tex. 2001) (extending Warsaw Convention's liability protections to independent contractor medical care provider contacted during in-flight emergency because its services were "given in furtherance of the contract of carriage"); *see also Croucher v. Worldwide Flight Servs., Inc.*, 111 F. Supp. 2d 501, 505 (D.N.J. 2000) (collecting cases). In doing so, these courts have looked to the Convention's purpose. *See, e.g.*, *Reed v. Wiser*, 555 F.2d 1079, 1090 (2d Cir. 1977). In *Reed*, the Second Circuit extended the Warsaw Convention's liability protection to airline employees, describing the "desire to establish a

18

issue because we conclude below that the Convention is inapplicable for other reasons, even if the cargo was in Expeditors's charge.

 2. The Cargo Was Damaged During Carriage by Land.

Having assumed that the cargo was in the charge of the carrier, we next consider whether the exclusion applies. Paragraph four of Article 18 excludes from the definition of carriage by air all carriage by land, sea, or inland waterway outside an airport. The district court found that TriQuint's cargo was damaged outside Miami International Airport, either in Forward Air's Miami warehouse or on Forward Air's truck while traveling between Miami and Orlando.[15] To determine whether the exclusion applies, we must decide whether these periods qualify as carriage by land.

We readily conclude that the cargo was in carriage by land when it was on Forward Air's truck traveling from Miami to Orlando—an intercity, multi-hour journey over land. Although Article 18 does not define "carriage by land," we

_____

uniform body of world-wide liability rules to govern international aviation" as a fundamental purpose of the Warsaw Convention. *Reed* explained that this purpose would be subverted if plaintiffs could "circumvent the Convention's limitation by bringing suit against the pilot or some other employee of the airline involved ." *Id.* at 1092. By the same token, if the Montreal Convention did not extend to independent contractors, then carriers could subvert its same goal of uniformity by hiring such contractors in any situation where local laws would provide for less generous recovery than the Convention. *Cf. Archer v. Trans/Am. Servs., Ltd.*, 834 F.2d 1570, 1573 (11th Cir. 1988) (holding independent food and beverage contractor aboard cruise ship to be agent because otherwise "the ship owner or operator could contract for its entire operation" and thereby "escape all accountability for the ship's condition and the conduct of those working aboard").

 [15] The parties do not challenge this finding on appeal.

19

conclude that it unambiguously applies to such a journey. Indeed, if an intercity, multi-hour journey over land does not qualify as carriage by land, the term essentially would be meaningless.

The more difficult question is whether the cargo was in carriage by land when it was stored at Forward Air's Miami warehouse before the journey to Orlando. We can discern from the text and structure of Article 18—with its broad definition of carriage by air, its exclusion, and its exceptions—as well as from our own experience, that a single contract for international transport may involve both carriage by air and carriage by land. So the fact that the cargo later was in carriage by land does not necessarily tell us that the cargo was in carriage by land when it was stored in the warehouse. Lacking a definition of the term, the plain text of the treaty does not tell us whether "carriage by land" includes the time when the cargo is in storage before or after being loaded on the truck—that is, when the cargo is not literally being carried over land. We therefore conclude that the treaty is ambiguous with respect to this question.

To resolve this ambiguity, we begin by considering the parties' arguments about whether the period of storage qualifies as carriage by land or carriage by air. Each party urges us to construe the Montreal Convention as establishing a bright line rule governing the storage of cargo in a warehouse. The transporters urge us to read carriage by air as ceasing at the airport's boundary, meaning that any time

20

the cargo is stored at a warehouse outside an airport's border qualifies as carriage by land. And Lloyds interprets carriage by land literally to refer only to the movement of the cargo over land, meaning that any time when the cargo is stored in a warehouse qualifies as carriage by air.

We are unpersuaded by the parties' approaches. After considering the negotiating history of the Convention, the conduct of the parties to the Convention, and the weight of precedent in foreign and American courts, *see Air France*, 470 U.S. at 400, we conclude that to determine whether a period of storage in a warehouse qualifies as carriage by land we must consider the specific facts and circumstances of the storage to determine whether it was more closely related to the cargo's transportation by air or by truck. Here, the facts and circumstances of Forward Air's storage of the cargo in Miami reflect that the storage was incident to the cargo's transportation by truck. Thus, the robotic arm was damaged during carriage by land, and the Convention does not apply.

> a.     We Reject the Transporters' Approach, Which Ends Carriage by Air at an Airport's Boundary.

The simplest reading of the exclusion ends carriage by air at the airport's boundary. Under this interpretation, favored by the transporters, carriage by air is restricted to when the cargo is on board an aircraft or being transported under the contract of carriage within the confines of an airport. This essentially geographical approach was the dominant interpretation of the analogous Article 18 in the

21

Warsaw Convention, and several courts and commentators have continued to apply it to the Montreal Convention. *See Batteries "R" Us Co. v. Fega Express Corp.*, No. 15-21507-Civ, 2015 WL 4549497, at *2 (S.D. Fla. July 27, 2015) (concluding that "the carriage by air period does not extend to ground transportation of cargo that occurs off the airport premises"); *Masudi v. Brady Cargo Servs., Inc.*, No. 12-CV-2391, 2014 WL 4416502, at *5 (E.D.N.Y. Sept. 8, 2014) ("For purposes of Article 18, the period of carriage by air does not extend to transport outside an airport."); *Montreal Convention* ch. III, art. 18, para. 86 (Elmar Giemulla & Ronald Schmid, eds., 2006) ("Paragraph 4 sentence 1 provides that cargo ceases to be transported during carriage by air and the period of liability ends once cargo is taken beyond the airport perimeter by land, sea or inland waterway.").

This interpretation suffers from two serious flaws, however. First, it ignores the Montreal Convention's drafting history. Article 18's definition of carriage by air—"the period during which the cargo is in charge of the carrier," Montreal Convention art. 18(3)—is different from the Warsaw Convention's definition in one important respect: the Montreal Convention omitted the Warsaw Convention's final phrase, "whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever." Warsaw Convention art. 18(2). Setting aside an out-of-airport landing, that phrase limited the Warsaw Convention's reach to cargo "in an airport or on board an aircraft." *Id.*

22

By deleting the phrase, the drafters of the Montreal Convention evinced the intent to expand carriage by air beyond the strict geographic boundaries of the airport.

The State Department Explanatory Note that accompanied the Montreal Convention to the United States Senate for ratification explained that the Convention's drafters intentionally omitted this phrase "to make clear that the Convention applies whenever and wherever the cargo is in the possession custody or charge of the carrier, *whether on or off airport premises*."[16]  *See* S. Treaty Doc. No. 106-45 art. 18(3) (internal quotation marks omitted) (emphasis added). Defining carriage by land in strictly geographical terms (on versus off airport premises) thus requires us to ignore the Montreal Convention's drafting history. And we should not do so lightly.  As the Senate Committee on Foreign Relations report recommending the treaty for ratification noted, the drafters of the Montreal Convention sought to retain as much of the existing language of the Warsaw

_____

[16] At least one American court has taken this State Department note literally and applied the Montreal Convention "whenever and wherever" cargo was damaged while in the charge of a carrier. *See AIG Prop. & Cas., Co. v. Fed. Express Corp.*, No. 15-cv-6316, 2016 WL 305053, at *6 (S.D.N.Y. Jan. 25, 2016) ("Unlike the prior language used in Article 18 of the Warsaw Convention, the Montreal Convention does not limit the scope of coverage of paragraph 3 to the period during which the carrier is in possession of the cargo at an airport or on board an aircraft.").  But, as the transporters point out, this broad interpretation renders the exclusion meaningless, violating the canon of construction that "[i]f possible, every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *In re Appling*, 848 F.3d 953, 959 (11th Cir. 2017) (internal quotation marks omitted).  If the Convention applies "whenever and wherever" cargo is in the charge of the carrier, then it must necessarily apply during "carriage by land, by sea or by inland waterway . . . outside an airport" if such carriage occurs.  Montreal Convention art. 18(4).  Because it effectively nullifies the exclusion, we reject this interpretation.

23

Convention as possible so as to preserve the substantial body of existing precedent and avoid uncertainty:

> While the Montreal Convention provides essential improvements upon the Warsaw Convention and its related protocols, efforts were made in the negotiations and drafting to retain existing language and substance of other provisions to preserve judicial precedent relating to other aspects of the Warsaw Convention, in order to avoid unnecessary litigation over issues already decided by the courts under the Warsaw Convention and its related protocols.

S. Exec. Rpt. No. 108-8, at 3 (2003) (internal quotation marks omitted).  Given the importance the drafters placed on retaining language that did not need to be changed, we must resist ignoring the revisions they felt it necessary to make.

The second problem with interpreting carriage by land in strictly geographical terms is that it ignores the reality of modern air cargo transit.  The State Department Explanatory Note advised that courts applying Article 18 "are expected to take into consideration the facts associated with modern methods of cargo air transport."  S. Treaty Doc. No. 106-45 art. 18(4).  Taking such facts into account, the dissent to an American case interpreting the Warsaw Convention explained why a focus on the airport's boundary is misplaced.[17]  In *Victoria Sales*

---

[17] On a related note, it may not be entirely clear where the boundaries of an airport lie. *Compare* 49 U.S.C. § 40102 ("'[A]irport' means a landing area used regularly by aircraft for receiving or discharging passengers or cargo.") *and Edwards v. F.A.A.*, 367 F.3d 764, 768 (8th Cir. 2004) ("[T]he ALJ reasonably determined this heliport was an airport . . . .  The plain language of the aviation regulation does not require that the airport comply with any licensing requirements.  Rather, the language is straightforward and functional: if land is used for, or is intended to be used for, the landing and taking off of aircraft, then that area of land is an airport.") *with* 14 C.F.R. 1.1 ("Airport means an area of land or water that is used or intended to

24

*Corp. v. Emery Freight, Inc.*, the Second Circuit, viewing the definition of carriage by air as "draw[ing] the line at the airport's border," declined to apply the Warsaw Convention to a loss that occurred at a carrier's warehouse "near but nonetheless outside the boundaries" of the airport. 917 F.2d 705, 707 (2d Cir. 1990). The dissent argued that airports should be viewed as "functional rather than 'metes and bounds' entities . . . . [b]ecause of the tremendous growth in air cargo transportation and the virtual impossibility of crowding all the unloading and delivery facilities of every carrier into the geographical confines of busy airports." *Id.* at 710 (Van Graafeiland, J., concurring in part and dissenting in part). We find the dissent's reasoning especially persuasive as applied to the Montreal Convention, which lacks the restrictive "whether in an airport or on board an aircraft" language of the Warsaw Convention. *See* 917 F.2d at 707. We believe that interpreting Article 18 such that carriage by air always ceases at the airport's border ignores persuasive evidence of the Convention signatories' intent.

        b.     We Reject Lloyds's Approach, Which Limits Carriage by Land to When the Cargo Is on a Truck.

A second interpretation, proposed by Lloyds, seems faithful to the text of the Convention but cuts against the purposes animating it. Under this interpretation, cargo is covered by the Montreal Convention off airport grounds whenever it is in

---

be used for the landing and takeoff of aircraft, *and includes its buildings and facilities, if any*." (emphasis added)).

25

the "charge of the carrier," except during movement over land or sea.  Put differently, Lloyds proposes that whenever cargo is in the charge of the carrier and not on a truck, the Montreal Convention applies, but once the cargo is placed on a truck, the Convention ceases to apply until the cargo is unloaded.

Lloyds points to two international cases that appear to have adopted this interpretation.[18]  In the first case, the Austrian Supreme Court considered an insurer's claim that its insured's cargo was damaged by improper storage in Philadelphia on the way from Austria to a customer in the United States.  Oberster Gerichtshof [OGH] [Supreme Court] Jan. 19, 2011, 7 Ob 147/10h, TranspR 2011, 264, 265 (Austria) [https://perma.cc/64R9-5X4Q].  The cargo was driven by truck to Germany, flown from an airport there to Philadelphia, and then transported by truck to a warehouse outside the Philadelphia airport where it was to clear customs before being delivered to the recipient.  *Id.*  The cargo suffered damage while in that warehouse.  *Id.*  Reversing a lower court decision, the Austrian Supreme Court determined that the Montreal Convention applied to the stored cargo "even if it is situated outside the airport" because such storage was still part of carriage by air "when the air carrier was 'in charge' of the transported goods" under paragraph three of Article 18.  *Id.* at 267.  The court conceded, however, that in light of the exclusion for carriage by land, its own interpretation of Article 18 "leads to a

---

[18] Lloyds provided certified translations of these two cases.  The transporters challenge Lloyds' interpretation of these cases but not the accuracy of the translations.

contradiction" because "it seems meaningless to subject transport to the warehouses of the air freight carrier which are outside the airport to a different liability regulation than the storage [in the warehouse] governed by the" Montreal Convention. *Id.* at 268.

In the second case, a transporter flew cargo from Germany to Miami, Florida. When the cargo arrived in Miami, it was stored in a warehouse near the airport before being delivered by land to its final destination in Miami. The cargo was lost either during storage in the Miami warehouse or while on the truck for delivery. A German court held that the Montreal Convention applied because the cargo remained in the charge of the carrier. *See* Bundesgerichtshof [BGH] [Federal Court of Justice] Feb. 24, 2011, I ZR 91/10, TranspR 2011, 436, 436 (Ger.) [https://perma.cc/8WNB-JB99].

To reach its conclusion, the German court considered whether the periods when the cargo was being stored in the warehouse and loaded on the truck qualified as carriage by air or carriage by land and then applied the rebuttable presumption. The court determined that the period when the cargo was stored in the warehouse qualified as carriage by air because the cargo remained in the custody or control of the air carrier. *Id.* at 438. But the court failed to consider whether the exclusion applied, that is, whether the period of storage nonetheless qualified as carriage by land. It appears the court implicitly assumed that because

27

the cargo was not on a truck, the period of storage could not be carriage by land. Next, the court considered the period when the cargo was on the truck, easily concluding that this period qualified as carriage by land. *Id.* at 438-39.  The court then applied the rebuttable presumption: because the transportation involved both carriage by land and carriage by air, the court presumed that the damage occurred during carriage by air. *Id.* at 439.  Finally, the German court concluded that the presumption was not overcome under the facts of the case.  The evidence showed that the cargo was either damaged at the warehouse—that is, in carriage by air—or on the truck— in carriage by land.  Because the injured party failed to prove that the cargo was damaged in carriage by land, the court held, the presumption was not overcome.

We are no more persuaded by Lloyds's interpretation (and that of the German and Austrian courts) limiting the period of carriage by land to the cargo's travel on a truck than we are by the transporters' interpretation limiting carriage by air to the time when the cargo is on an airport's premises.  Based on our earlier observation that the Montreal Convention's drafters accepted that the period of carriage by air includes more than actual transport on an airplane, it seems likely

28

that the period of carriage by land similarly may extend beyond when the cargo is actually onboard a truck.[19]

Indeed, strictly limiting carriage by land to the period when cargo is actually aboard a truck seems inconsistent with the realities of modern cargo transport, which may require that cargo be stored in a warehouse as part and parcel of transit over land. It is not hard to imagine that if a lengthy journey by truck is needed to transport the cargo to its final destination, a trucking company may need to drive the cargo part of the way, store it in a warehouse, and load it onto another truck to be taken to another city for its final destination. We see no good reason why storage between two legs of such a journey by truck should be treated as carriage by air. Lloyds's interpretation seems to fly in the face of the Montreal Convention's preamble recognizing "the need to modernize and consolidate the Warsaw Convention" to reflect the realities of modern cargo air transport. *See* Montreal Convention pmbl. Honoring this purpose, we decline to adopt a view of the interplay of paragraphs three and four of Article 18 that one commentator—

---

[19] We acknowledge that we must give "considerable weight" to the opinions of courts of other signatories interpreting Article 18, *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999) (internal quotation marks omitted). But after careful consideration, we are unpersuaded by the decisions of the German and Austrian courts because after concluding that the cargo was in the charge of the carrier, these courts failed to consider whether the exclusion applied and the period of warehouse storage qualified as carriage by land. We do not agree with the premise underlying these decisions, that carriage by land is limited to periods when cargo is loaded on a truck.

focusing on the same contradiction highlighted by the Austrian court—has dubbed "a commercial paradox."[20]

> c.    We Conclude That Carriage by Land May Include Periods of Storage and That the Storage at Forward Air's Miami Warehouse Qualifies as Carriage by Land.

As we explained above, given the realities of modern air transport of cargo, when a shipment of cargo involves transportation both by air and by truck, it is likely that the cargo will need to be stored after being unloaded from the airplane but before being loaded onto the truck.  Whether that period of storage constitutes carriage by air or carriage by land will depend on the facts of each case.  Adopting a bright line test like the parties urge us to do would be inconsistent with the intent and purpose of the Convention.

We hold today that the cargo at issue, which was flown internationally on an airplane, offloaded from the airplane, transported to a carrier's off-airport warehouse, delivered to a trucking company, and stored by the trucking company in a separate warehouse before being loaded onto a truck for a multi-hour journey to its final destination, was in carriage by land when it was stored at the trucking company's warehouse.  These facts establish that the warehouse storage at issue occurred as part and parcel of the last step of the cargo's journey, which was plainly carriage by land.

---

[20] *See* 1 Shawcross & Beaumont, *Air Law* (LexisNexis Butterworths) No. 150, at para. 973 (Sept. 26, 2016).

This conclusion is consistent with Article 18's drafting history. After all, by deleting language restricting carriage by air to on-airport premises, the drafters of the Convention recognized that carriage by air could include periods when the cargo was off an airport's premises. *See* S. Treaty Doc. No. 106-45 art. 18(3). And the rebuttable presumption indicates that although the drafters recognized that the periods when cargo was off airport premises *could* qualify as carriage by air, such periods were not *necessarily* carriage by air. Montreal Convention art. 18(4). And by considering the practical characteristics of each stage of the cargo's journey, including the time when it was in storage, we give effect to the drafters' intent that the Convention be interpreted in light of the realities of modern air transport. *See* S. Treaty No. 106-45 art 18(4). Accordingly, the Montreal Convention's exclusion applies because the periods when the cargo was at Forward Air's warehouse and on the journey from Miami to Orlando qualify as "carriage by land."

3.  <u>The Presumption that the Damage Occurred During Carriage by Air Is Rebutted Based on the District Court's Factual Findings about When the Damage Occurred.</u>

Because the cargo here moved in both carriage by air and carriage by land in the performance of a contract for air transport, we must decide whether the presumption applies. The Convention instructs that we must presume that the damage occurred during carriage by air unless it was proven that the damaged

31

occurred during carriage by land. *See* Montreal Convention art. 18(4) ("If, however, such carriage takes place in the performance of a contract for carriage by air. . . any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air."). The district court determined that because the transporters failed to prove that the damage occurred during carriage by land, it must presume that the damage occurring during carriage by air, meaning the Montreal Convention governed the transporters' liability for damages.

We disagree with the district court's analysis. Under the district court's findings of fact, the cargo was damaged in either in Forward Air's Miami warehouse or on its truck while traveling between Miami and Orlando, both of which we have determined qualify as carriage by land. To review, Expeditors hired Forward Air to move the cargo by truck from Miami to Orlando. Forward Air took custody of the cargo at Expeditors' warehouse near Miami International Airport and transported it to Forward Air's Miami warehouse. The cargo was undamaged when it arrived at Forward Air's warehouse. Forward Air then transported the cargo by truck between its facilities in Miami and Orlando. The cargo had been damaged by the time it arrived in Orlando. The district court's finding that the cargo was damaged in Forward Air's custody—either in Miami or

32

during the journey to Orlando—rebutted the presumption that the damage occurred during carriage by air.

Because the transporters proved that the cargo was damaged during carriage by land, the presumption does not dictate the outcome of this case. To be sure, the court did not pinpoint the precise location where the cargo was damaged. But it limited the occurrence of that damage to two possible locations: Forward Air's Miami warehouse or Forward Air's truck traveling between Miami and Orlando. The district court's unchallenged findings established "proof to the contrary" that the machine was damaged during carriage by air as that term is defined in Article 18.

Lloyds does not dispute that paragraph four creates a presumption that damage occurred during carriage by air absent proof to the contrary, but it argues that the district court found no such proof in this case. The insurer contends that the district court's analysis of where the damage occurred demonstrates that the court lacked proof sufficient to rebut the presumption. The court acknowledged that it lacked "direct evidence of how exactly the damage occurred," but it nevertheless determined that "the logical conclusion, based on the circumstantial evidence, is that the damage occurred while in the custody of Forward Air in Miami or in transit to Forward Air's Orlando facility." Am. Final J. 6 (Doc. 143).

33

Lloyds suggests that a party must offer direct evidence of precisely where damage to cargo occurred to rebut the presumption. But this argument finds no support in the text of the Convention, which merely requires "proof to the contrary" that damage "was the result of an event that took place during the carriage by air." Montreal Convention art. 18(4). That is, the Convention does not require proof of precisely where the damage occurred but rather proof that the damage did *not* occur during carriage by air. Moreover, a requirement of "proof" generally does not demand that the evidence be direct rather than circumstantial. *See, e.g.*, *A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1005 n.2 (11th Cir. 2003) (hypothesizing in a shipping case that this Court would "accept[] circumstantial evidence for the requisite proof" of cargo damage even under the heightened standard applied in sealed container cases); *Sun Underwriters Ins. Co. of N.Y. v. Loyola Univ.*, 196 F.2d 169, 170 (5th Cir. 1952) (allowing proof that damages fell within an insurance contract's coverage "by direct and circumstantial evidence").[21]

Here, the transporters proved that the damage occurred during carriage by land. We thus conclude that the presumption is rebutted.

---

[21] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

4.      The Substitution Exception Does Not Apply Because the Consignor Consented to an Alternative Mode of Transportation.

The district court did not consider the substitution exception, though in denying a post-trial motion filed by the transporters, the court reached a conclusion that arguably supports the application of the exception.[22]  On appeal, Lloyds urges us to rely on the substitution exception as an alternative basis for upholding the district court's ruling that the Montreal Convention applies.  We decline to do so because under the waybill the substitute carriage was consensual.

As we explained above, the substitution exception, contained in the third sentence of paragraph 4, extends the Montreal Convention's coverage to carriage by land substituted for carriage by air without the consent of the sender.  *See* Montreal Convention art. 18(4).  Put differently, damage occurring during non-consensual substitute carriage will be deemed to have occurred during carriage by

---

[22] The district court explained:

> It is undisputed that the parties contracted, pursuant to the Air Waybill, for airport-to-airport trans-shipment of the machine from South Korea to Orlando, Florida.  In fact, the air waybill lists "Air Waybill" under the heading "Non Negotiable."  Even though the Air Waybill also provides that "ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD OR OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON BY SHIPPER . . .," the Defendants have not established that they could unilaterally, and without notice to the shipper, modify the contracted airport-to-airport method of shipment.

Order at 1 (citations omitted) (Doc. 151).

35

air, bringing it within the scope of the Montreal Convention.[23] The key to determining whether the substitution exception applies when cargo was transported by both air and non-air carriage is consent. Specifically, did the consignor consent to substitute carriage?

To answer this question, we turn to the waybill and interpret it like any other contract.[24] Under general principles of contract interpretation,[25] "[t]he plain meaning of a contract's language governs its interpretation." *In re FFS Data, Inc.*, 776 F.3d 1299, 1305 (11th Cir. 2015) (internal quotation marks omitted). "[A] document should be read to give effect to all its provisions and to render them consistent with each other." *Id.* (internal quotation marks omitted) (citing Restatement (Second) of Contracts § 203(a) (Am. Law. Inst. 1981)).

---

[23] *See Montreal Convention* ch. III, art. 18, para. 114 (Elmar Giemulla & Ronald Schmid, eds., 2006) ("The substitution of carriage by air by surface transportation constitutes a breach of contract if the consignor has not consented to its substitution . . . .").

[24] Because the district court concluded that the Montreal Convention controlled, it did not interpret the waybill. But because the waybill unambiguously permitted the transporters to substitute carriage, we may interpret it in the first instance. *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014).

[25] The parties agree that federal common law governs our interpretation of the waybill. Given this agreement, we assume without deciding that federal common law governs. *See Garwood v. Int'l Paper Co.*, 666 F.2d 217 (5th Cir. Unit B 1982). Federal common law directs us to look to "general common law on contracts." *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 n.11 (11th Cir. 2008).

In *Stein v. Reynolds Securities, Inc.*, we adopted as binding precedent all post-September 30, 1981 decisions of Unit B of the former Fifth Circuit. 667 F.2d 33, 34 (11th Cir. 1982).

Here, the plain language of the waybill unambiguously established that the

consignor (here, termed the "shipper") consented to substitute carriage.  The front

of the waybill included the following language:

> ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS
> INCLUDING ROAD OR ANY OTHER CARRIER UNLESS
> SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON
> BY THE SHIPPER . . . .

Air Waybill (Doc. 78-3).  "ANY OTHER MEANS INCLUDING ROAD"

expressly allowed Expeditors to substitute carriage by truck.  Any other

interpretation would render this term meaningless.[26]

In its order denying the transporters' post-trial motion, the district court

suggested that substituting carriage by truck for the journey's final leg amounted to

a unilateral modification of the airport-to-airport waybill done without notice to the

shipper.  We disagree because in the waybill Expeditors expressly reserved the

right to substitute carriage by other means.  Because the shipper consented to

substitute carriage in the waybill, and there was no evidence of "contrary

instructions," Air Waybill (Doc. 78-3), the substitution exception does not affect

our conclusion that the Montreal Convention does not apply.

\* \* \*

---

[26] Lloyds offers the strained argument that to comply with this term of the waybill, Expeditors would have had to notify the shipper of its intent to substitute carriage by truck, at which time the shipper could have given the "specific contrary instructions" contemplated by the term.  But the waybill contains no notice requirement and, to the contrary, puts the onus on the shipper, reserving to Expeditors the right to substitute carriage unless the shipper gave contrary instructions.

In summary, we conclude that the Montreal Convention does not govern. We assume the cargo was damaged in the charge of the carrier. Although the journey involved both carriage by air and carriage by land, the presumption that the damage occurred during carriage by air is overcome because the district court's unchallenged findings of fact establish the cargo was in carriage by land when damaged. Because the damage occurred during carriage by land and the substitution exception does not apply, the Montreal Convention's cap on liability does not apply either.

## B. The Waybill's Damages Provision Is Ambiguous as to How to Calculate Liability.

Because the Montreal Convention does not apply, the waybill governs the calculation of damages in this case. The waybill limits damages to 19 SDRs multiplied by the weight (in kilograms) of the damaged shipment:

> 4.    Except as otherwise provided in Expeditors' tariffs or conditions of carriage, in carriage to which the Montreal Convention does not apply Expeditors' liability limitations for cargo lost, damaged or delayed shall be 19 SDRs per kilogram . . . .

Air Waybill (Doc. 78-3). The waybill specifies that the weight used to calculate damages is the weight that was used to determine shipping charges:

> 6.    In any case of loss of, damage to, or delay to a shipment, the weight to be used in determining Expeditors' limit of liability shall be the weight that is used to determine the charge for carriage of such shipment.

38

*Id.* The waybill then describes what happens if only "part of the cargo" was damaged:

> In any case of loss of, damage to, or delay to part of the cargo, the weight to be taken into account in determining Expeditors' limit of liability shall be only the weight of the package or packages concerned.

*Id.* The scope of the transporters' liability under the waybill turns on whether "package or packages concerned" refers only to packages actually lost, damaged, or delayed or includes packages that diminished in value due to the loss, damage, or delay of related packages.

Lloyds argues that the weight of all the packages should be used to calculate damages because the district court found that the entire machine was useless without the damaged robotic arm.[27] Lloyds contends that the damage to the arm unambiguously "concerned" the contents of all ten packages. The transporters argue that the weight of only the damaged packages should be used because the term "package or packages concerned" unambiguously refers only to the package that was actually lost, damaged, or delayed.

We conclude that the phrase "package or packages concerned" is ambiguous because it "is susceptible to two or more reasonable interpretations that can fairly be made." *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th

---

[27] The district court found that the damage to the robotic arm affected the functionality and value of the pieces contained in the other nine crates because the other pieces of the machine could only be used in conjunction with the arm. The transporters do not challenge this finding.

Cir. 1993). The core phrase in the waybill's liability provision caps the transporters' liability based upon the weight of cargo "concerned," so the issue necessarily turns on the definition of "concern." One dictionary defines the term "concern" as follows: "To have to do with or relate to." *Concern*, American Heritage College Dictionary 296 (4th ed. 2002). With this broad definition, "concerned" reasonably could have the meaning Lloyds ascribes it. We recognize, of course, that the packages actually lost, damaged, or delayed relate to the act of losing, damaging, or delaying the cargo. But, packages that diminish in value due to the loss, damage, or delay of related packages can also be said to relate to the carrier's act that led to the claim. Thus, the term "concern" does not, on its face, foreclose calculating the transporters' liability based upon the weight of any (or all) packages that diminished in value due to the damage.

The waybill's liability limitation is borrowed from the Warsaw and Montreal Conventions, and the history of the Warsaw Convention highlights the ambiguity of the phrase "package or packages concerned."[28] Indeed, when the 1955 Hague Protocol amended the Warsaw Convention to add the "affected weight standard" sentence (a sentence which was omitted from Expeditors' waybill), the

---

[28] We recognize that treaty interpretation is distinct from contract interpretation. We are not saying that the fact that language in a treaty is ambiguous necessarily means that the same language in a contract is ambiguous. But we nevertheless conclude in this specific circumstance that the fact that identical language in the Warsaw Convention was viewed as ambiguous supports our conclusion that the waybill's identical liability limitation is ambiguous.

40

International Air Traffic Association explained that it "had reached the conclusion that there was ambiguity in the present Convention as to problems of settlement for partial loss." *Motorola, Inc. v. Fed. Express Corp.*, 308 F.3d 995, 999-1000 (9th Cir. 2002) (citing International Conference on Private Air Law: Vol. I, Minutes of Twentieth Meeting, Sept. 19, 1995 at p. 252). To illustrate the ambiguity, at least one delegation to the 1955 Hague Convention interpreted the Warsaw Convention's original liability limitation—which referred to the "package or packages concerned"—to allow a shipper to recover based on the total weight of the shipment when a carrier lost "one of a number of articles being carried." *Id.* at 1000 (internal quotation marks omitted). For these reasons, we conclude that the waybill's limitation of damages to the weight of the "package or packages concerned" may be interpreted in two ways: (1) as limiting the carrier's liability to the weight of packages that were *actually damaged*, or (2) to the weight of packages that were *significantly diminished in value*.

We acknowledge that the Ninth Circuit analyzed an identical waybill provision in *Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190 (9th Cir 1999), and held that it was unambiguous. The Ninth Circuit offered only this brief analysis of the phrase at issue: "By referring to the 'package or packages concerned,' the [carrier's] contract clearly contemplates that shipments may consist of multiple packages, and that only the damaged individual packages are

41

the measure of damages." *Id.* at 1199. We agree that the liability limitation contemplates the commercial reality that shipments often are placed in multiple packages. But we disagree that the waybill's liability limitation provides a clear answer to the problem presented here. We are unpersuaded by the Ninth Circuit's analysis, which failed to explain why under the waybill "only the [actually] damaged individual packages are the measure of damages." *Id.*

Given the ambiguity in the waybill, under federal common law, extrinsic evidence, such as industry custom or usage, may be examined to help shed light on its meaning. *See United States ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 779 (11th Cir. 1990). And because the meaning of a contractual provision in light of extrinsic evidence presents a question of fact, rather than one of law, we remand for the district court to address this issue in the first instance. *See In Re Stratford of Tex., Inc.*, 635 F.2d 365, 368 (5th Cir. 1981). Although we acknowledge that we may "in our discretion resolve questions not addressed by the district court," *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 609 (11th Cir. 1991), we conclude that it would be inappropriate for us to exercise such discretion here because of the need for the taking of evidence and fact finding.[29]

---

[29] Lloyds argues that if the waybill is ambiguous, we must construe it against the transporters because Expeditors drafted the agreement. But we apply the rule of construction that an ambiguous contract provision should be construed against the drafter only after applying other rules of construction and considering extrinsic evidence, including about industry custom and practice. *See Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409,

42

## IV.    CONCLUSION

In interpreting the Montreal Convention, we sympathize with the late Justice Scalia's remarks about the Warsaw Convention:  "How many smart people from how many countries came up with this— with this formulation?  You think they . . . could have said it more clearly."  Tr. of Oral Argument at 21, *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155 (1999) (No. 97-475), 1998 WL 801059, at *21 (Scalia, J.) (referring to Articles 17 and 24 of the Warsaw Convention).  The provisions of the Montreal Convention we interpret in this opinion are as abstruse as they are important.  We conclude that the Convention assuredly does not apply, meaning the waybill sets the limitation of the transporters' liability.  Because the waybill's limitation of liability provision is ambiguous as to whether the weight of only the packages actually lost, damaged, or delayed may be considered or whether the weight of packages that are diminished in value due to the loss, damage, or delay of related packages also may be considered, we remand to the district court for further fact finding and interpretation of this provision.

**VACATED AND REMANDED.**

---

423-24 (6th Cir. 2008) (explaining how this rule should be applied under federal common law when construing bill of lading agreement governing ocean carrier's shipment of cargo); Restatement (Second) of Contracts § 206 cmt. a (explaining that contract should be construed against drafter only "so long as other factors are not decisive").  Thus, we cannot agree with Lloyds that we must construe the waybill against the transporters before the district court considers extrinsic evidence.  We leave the application of this rule of construction to the sound discretion of the district court.

43

JORDAN, Circuit Judge, concurring in part and concurring in the judgment.

I am thankful for Judge Pryor's thoughtful and insightful analysis, and concur in Parts I, II, and III.B of the majority opinion. As to Part III.A, I concur only in the judgment because my approach with respect to the applicability of the Montreal Convention is a bit different (and, some might say, a bit too simplistic).

As the court correctly notes, Article 18(3) of the Montreal Convention ("carriage by air . . . comprises the period during which the cargo is in charge of the carrier") extends "carriage by air" beyond the time in which cargo is actually on board an airplane. The question for us is how far beyond actual air transportation the term "carriage by air" extends given the exclusion in Article 18(4) ("[t]he period of the carriage by air does not extend to any carriage by land, by sea or by inland waterway performed outside an airport") and the first exception to that exclusion, the bedeviling rebuttable presumption ("[i]f, however, such carriage takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery, or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air"). Article 18(4), in my view, is not a model of clear draftsmanship. What the exclusion attempts to take away the exception tries to give back.

44

The district court found that the damage to the cargo took place outside Miami International Airport either in Forward Air's Miami warehouse or on Forward Air's truck en route from that warehouse to Orlando. Because no one challenges this finding on appeal, I think it makes sense to first apply that finding to each of the relevant provisions of the Montreal Convention, rather than beginning with treaty interpretation in the abstract.

Starting with Article 18(3), the damage occurred while the cargo was in the custody of the carrier—Expeditors Korea—or its agent, Forward Air. So, insofar as Article 18(3) is concerned, it is possible that the damage occurred during "carriage by air," and that the Montreal Convention applies. At this step, Lloyds is looking pretty good.

But the exclusion in Article 18(4), which narrows the broad definition of "carriage by air" set out in Article 18(3), indicates that the Montreal Convention does not apply. The damage took place while or after the cargo was driven by truck from locations outside Miami International Airport, and the exclusion states that "carriage by air does not extend to any carriage by land . . . performed outside an airport." I do not believe that the term "carriage by land" is ambiguous as applied in this case given the district court's factual findings. So now Expeditors and Forward Air seem to be in the driver's seat.

45

That leaves the first exception in Article 18(4). Some of the language in this exception seems to favor Lloyds ("[i]f . . . such carriage takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery or transhipment, any damage is presumed . . . to have been the result of an event which took place during the carriage by air"). But this language is qualified by the "subject to proof to the contrary" clause, and it seems to me that the district court's factual finding—that the damage occurred after or during transportation by truck to locations well outside the airport—sufficiently rebuts any claim that the damage took place during "carriage by air."

To recap, the term "carriage by air," despite the broad definition in Article 18(3), is limited by Article 18(4), and cannot extend indefinitely to any and all land transportation of cargo outside of an airport following a flight. Here the cargo was driven by two different trucks to two different warehouses, both outside Miami International Airport, before being taken by another truck to Orlando. Because the district court found that the damage occurred at the second warehouse or en route to Orlando, there is "adequate proof" that the damage occurred during "carriage by land." That means the presumption in the first exception of Article 18(4) has been adequately rebutted and that the exclusion applies. *See* Marian Hoeks, Multimodal Transport Law: The Law Applicable to the Multimodal Contract for the Carriage of Goods 240 (2010) ("if it is proven that the damage occurred elsewhere, the

46

presumption [in Article 18(4)] does not come into effect"); Montreal Convention ch. III, art. 18, para. 92 (Elmar Giemulla & Ronald Schmid, eds., 2006) ("The presumption is rebuttable and does not apply if proof exists that the damage was caused during surface transportation outside the airport."). I therefore agree with the court that, on this record, the Montreal Convention does not govern the issue of damages.