[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11989

Non-Argument Calendar

_____

CYPRESS PROPERTY, LLC,

a Florida Limited Liability Company,

Plaintiff-Appellee,

*versus*

JP MORGAN CHASE BANK NA.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23903-DPG

_____

2                    Opinion of the Court                    21-11989

Before LUCK, LAGOA, and EDMONDSON, Circuit Judges.


PER CURIAM:

In this Florida breach-of-contract case, Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") appeals the district court's grant of summary judgment in favor of Cypress Property, LLC ("Cypress"). Reversible error has been shown; we vacate the final judgment, reverse the grant of summary judgment, and remand for further proceedings.

## I.

In 2012, the parties entered into a 20-year Ground Lease ("Lease") pursuant to which JPMorgan agreed to lease property owned by Cypress. This appeal involves a dispute about the frequency with which the Base Rent increases under the Lease: once every year or once every five years. In pertinent part, the Lease includes this language about rent:

> 3.2    **Base Rent**. Tenant shall pay rent ("Base Rent") to Landlord in the amounts set forth below for the periods set forth below:
>
> . . .
>
> (b)    Commencing on the Rent Commencement Date and continuing through the last day of the sixtieth (60th) Lease Month of the Term, annual Base

Rent shall equal Two Hundred Eighty Five Thousand and NO/100 DOLLARS ($285,000.00) and shall be payable in equal monthly installments of Twenty Three Thousand Seven Hundred Fifty and 00/100 DOLLARS ($23,750.00), exclusive of sales/use tax.

(c)    Commencing on the first day of the sixty-first (61st) Lease Month following the Rent Commencement Date and on the first day of every fifth (5th) calendar year thereafter ("**Effective Change Date**"), Base Rent shall be increased annually by the percentage of increase in the "**CPI Index**" (hereinafter defined) which has occurred between the first calendar month immediately preceding the first full calendar month of the sixty (60) Lease Month period of any subsequent five (5) calendar year period then expiring, as the case may be (the "**Base Month**"), and the calendar month immediately preceding the month of the Effective Change Date in which the Base Rent is to be increased (the "**Comparison Month**") (e.g., if the Rent Commencement Date is July, 2011, then the first Base Month is June, 2011 and the first Comparison Month will be June, 2016).  Notwithstanding the percentage of increase established by the CPI Index on any Effective Change Date, Base Rent shall increase by a minimum of eight percent (8%) and a maximum of twelve percent (12%) on each Effective

Change Date.  Landlord shall notify Tenant of each increase in the Base Rent by a written statement setting forth the CPI Index for the Base Month, the CPI Index for the Comparison Month, the percentage increase between those two indices, and the amount of the adjusted Base Rent.  Tenant's obligation to pay the adjusted Base Rent shall accrue as of the Effective Change Date, notwithstanding any delay in Landlord's notice to Tenant . . ..  The term "CPI Index" shall mean the Consumer Price Index . . . prepared by the Bureau of Labor Statistics of the U.S. Department of Labor. . . . During the pendency of any dispute, Tenant shall continue to pay to Landlord annual Base Rent in the amount due and payable by Tenant prior to the Effective Change Date increased by 8% in equal monthly installments, subject to readjustment upon a final determination hereunder.

(d)     If Tenant exercises its right to renew the Lease as set forth in Section 2.7, annual Base Rent for the first Renewal Term and each exercised subsequent Renewal Term shall be determined in accordance with **Exhibit B** attached hereto.

Exhibit B reads this way:

Base Rent during any Renewal Term shall be adjusted in accordance with the CPI Index

adjustment described in Section 3.2(c) of the Lease
upon the first (1st) Lease Year of each Renewal Term.
Base Rent during any Renewal Term shall likewise be
adjusted every fifth (5th) Lease Year.

For the first five years of the Lease, JPMorgan paid the an-
nual Base Rent amount ($285,000) specified in section 3.2(b) of the
Lease. On 1 June 2018 (the first day of the sixty-first Lease Month
and the first Effective Change Date) Cypress increased the Base
Rent by 8.195% in accordance with the formula described in sec-
tion 3.2(c). JPMorgan paid the adjusted Base Rent ($308,355) with-
out dispute. One year later, on 1 June 2019, Cypress sought to in-
crease the Base Rent again by 8.195%, for a new Base Rent amount
of $333,660. JPMorgan disputed Cypress's ability to increase the
Base Rent a second time and continued to pay Base Rent at the
same amount JPMorgan paid during the prior year.

Cypress declared JPMorgan in default. Cypress later filed in
state court this civil action against JPMorgan for breach of contract.
JPMorgan removed the action to federal district court. Following
discovery, the parties filed cross-motions for summary judgment.

Cypress and JPMorgan each asserted that the unambiguous
language in section 3.2(c) supported its own interpretation about
the frequency of Base Rent increases provided under the Lease. Ac-
cording to Cypress, the Lease provided for increases in Base Rent
every year after the first five years of the Lease. JPMorgan, on the

other hand, asserted that Base Rent increases occurred only every five years on the "Effective Change Date."

Following a hearing on the cross-motions, the district court granted summary judgment in favor of Cypress. The district court determined that the Lease provided clearly and unambiguously for annual increases in the Base Rent after the first five-year Lease period. Having concluded that the Lease was unambiguous, the district court declined to consider extrinsic evidence of the parties' intent offered by JPMorgan.[1] The district court then concluded that JPMorgan breached the Lease by failing to pay the newly adjusted Base Rent amount. The district court entered final judgment in favor of Cypress in the amount of $156,066.64. This appeal followed.

## II.

We review *de novo* the district court's grant of summary judgment; we "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*). Summary judgment is appropriate when the record shows no

---

[1] In support of its motion for summary judgment, JPMorgan submitted a Letter of Intent between the parties, an internal Cypress email, and deposition testimony from JPMorgan's real estate lawyer: documents purporting to show the parties' intent to increase rent every five years.

genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Whether a contract provision is ambiguous is a question of law that we review *de novo*.  *See Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1246 (11th Cir. 2002).

In construing a contract under Florida law,[2] "the intention of the parties is to govern." *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.*, 215 So. 2d 336, 338 (Fla. Dist. Ct. App. 1968); *see Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So. 2d 544, 547 (Fla. Dist. Ct. App. 1973) ("It is well established that in construing a contract the leading object is to ascertain and effectuate the intent of the parties.").  To "ascertain the true intention of the parties," the court must consider the entire agreement.  *Peoples Gas Sys., Inc. v. City Gas Co.*, 147 So. 2d 334, 336 (Fla. Dist. Ct. App. 1962) (citing *Ross v. Savage*, 63 So. 148, 155 (Fla. 1913)).

When the contract language is clear and unambiguous, the court determines the parties' intent based solely upon the language used in the contract.  *See Royal Am. Realty, Inc.*, 215 So. 2d at 338. When the contract language is ambiguous, however, "then parol evidence is properly admissible, not for the purpose of changing or varying the terms of the written instrument, but to elucidate, explain or clarify the intention of the parties." *Id.*; *see Waveblast Watersports II, Inc. v. UH-Pompano, LLC*, 291 So. 3d 657, 661 (Fla.

---

[2] That the Lease is governed by Florida law is undisputed.

Dist. Ct. App. 2020) (noting that when contract language is ambiguous or unclear, extrinsic evidence of the parties' intent may be considered "to explain, clarify or elucidate the ambiguous language with reference to the subject matter of the contract, the circumstances surrounding its making, and the relation of the parties."). "A contract is ambiguous when it is reasonably or fairly susceptible to different constructions." *Royal Am. Realty, Inc.*, 215 So. 2d at 338.

Section 3.2(c) of the Lease establishes the frequency and method of calculating increases in Base Rent after the first five years of the Lease.  In determining that the Lease provided for annual increases in Base Rent, the district court focused exclusively on this phrase within the first sentence of section 3.2(c): "Base Rent shall be increased annually . . .."  We accept that this language could be interpreted (at least by itself) to mean that the Base Rent increases each year.

Other language in section 3.2(c), however, can also be construed reasonably as providing for an increase in Base Rent only on the "Effective Change Date": a date that is defined by the Lease as occurring every five years.  For example, section 3.2(c) provides that the amount of increase in Base Rent shall be calculated based upon the percentage of increase in the CPI Index over the five-year period immediately preceding "the month of the *Effective Change Date in which the Base Rent is to be increased.*"  Notwithstanding the calculated percentage increase in the CPI Index, section 3.2(c) states that the "*Base Rent shall increase* by a minimum of eight

percent (8%) and a maximum of twelve percent (12%) *on each Effective Change Date.*"  Section 3.2(c) provides further that the "Tenant's obligation to pay the *adjusted Base Rent shall accrue as of the Effective Change Date.*"  Section 3.2(c) also says that, during the pendency of any dispute about the adjusted Base Rent amount, "Tenant shall continue to pay to Landlord annual Base Rent in the amount due and payable by Tenant *prior to the Effective Change Date* increased by 8% in equal monthly installments, subject to readjustment upon a final determination hereunder."

Considering the language of section 3.2(c) in context with the other rent provisions in section 3.2 also supports a reasonable interpretation that the parties intended for the Base Rent to increase every five years throughout the duration of the Lease.  The rent provisions in section 3.2 are separated into three distinct timeframes: (1) the first 5 years of the 20-year Lease; (2) the remaining 15 years of the 20-year Lease; and (3) possible Renewal Terms beyond the initial 20-year Lease.  About the first timeframe, section 3.2(b) provides a fixed annual Base Rent applicable to the first five years of the Lease.  Section 3.2(d), meanwhile, governs the third timeframe: the annual Base Rent that applies to each 5-year Renewal Term beyond the original 20-year Lease.  As described in Exhibit B, the "Base Rent during any Renewal Term" will be adjusted according to the procedure set forth in Section 3.2(c) and "shall *likewise be adjusted every fifth (5th) Lease Year.*"

We read these portions of section 3.2 as providing a fixed Base Rent during the first five years of the Lease (the first

timeframe) and also during each five-year Renewal Term (the third timeframe).  Viewing the language in section 3.2 as a whole -- together with the "likewise" language in Exhibit B -- it is reasonable to construe section 3.2(c) as also providing for increases in Base Rent only every fifth year during Lease years six through twenty (the second timeframe).

Because the language in section 3.2(c) is susceptible to two reasonable constructions, we conclude that the language is ambiguous.  *See Royal Am. Realty, Inc.*, 215 So. 2d at 338.

Under Florida's rules of contract construction, "no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, *reasonable and consistent with other parts*, can be given to it, and where a contract contains apparent inconsistencies they must be given such an interpretation as will reconcile them *if possible.*"  *Id.* (emphasis added); *see Ross*, 63 So. at 155 ("In construing any written instrument, . . . the entire instrument must be considered in order to gather the real intent and to determine the true design of the makers thereof.  To that end, all the different provisions of such instruments must be looked to and all construed so as to give effect to each and every of them, *if that can reasonably be done.*" (emphasis added)).

In attempting to reconcile the inconsistent language in section 3.2(c) -- and give meaning to the word "annually" -- the district court determined that the Base Rent was to increase each year by a rate that would be calculated every five years on the Effective Change Date.  We cannot conclude that this interpretation is

21-11989            Opinion of the Court            11

"reasonable and consistent with other parts" of the Lease.  Among other things, this interpretation conflicts with -- and renders as surplusage -- the other language in section 3.2(c) and in Exhibit B that seems to indicate that increases to the Base Rent occur only on the Effective Change Date.

Because the pertinent Lease language is ambiguous, the district court erred in declining to consider extrinsic evidence of the parties' intent.  *See Waveblast Watersports II, Inc.*, 291 So. 3d at 661 (considering extrinsic evidence of the parties' intent to resolve an ambiguous term in a lease agreement); *Royal Am. Realty, Inc.*, 215 So. 2d at 338 (concluding that -- because the written brokerage agreement was ambiguous -- the trial court erred in refusing to consider parol evidence to determine the intention of the parties).[3]

---

[3] We are unpersuaded by Cypress's argument that no extrinsic evidence of the parties' intent is admissible in this case because the Lease contains only a "patent" ambiguity.  Florida courts historically have distinguished between patent and latent ambiguities and have permitted extrinsic evidence only to resolve the latter.  *See Crown Mgmt. Corp. v. Goodman*, 452 So. 2d 49, 51-52 (Fla. Dist. Ct. App. 1984).  A patent ambiguity is one that "appears on the face of the instrument and arises from the use of defective, obscure, or insensible language," while a latent ambiguity exists "where a contract fails to specify the rights or duties of the parties in certain situations."  *Id.*  A third category known as intermediate ambiguity arises in situations where -- as in this case -- the words used are sensible and have a settled meaning but where the writing may be subject to two interpretations.  *See Ace Elec. Supply Co.*, 288 So. 2d at 547.  Intermediate ambiguities are treated as latent and may be resolved by considering extrinsic evidence of the parties' intent.  *Id.* at 547-48.  Some Florida courts have also indicated that the patent/latent distinction has become less

12                    Opinion of the Court                    21-11989

On appeal, JPMorgan urges us to resolve the ambiguity as a matter of law by considering what JPMorgan says is undisputed extrinsic evidence of the parties' intent. We decline to do so. Instead, we remand so that the district court may consider in the first instance the extrinsic evidence of the parties' intent. *See Underwriters at Lloyds v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1053 (11th Cir. 2018) (vacating and remanding to the district court to consider extrinsic evidence "because the meaning of a contractual provision in light of extrinsic evidence presents a question of fact, rather than one of law"); *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. Dist. Ct. App. 2001) (noting that "where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment.").

We also reject Cypress's argument that we should construe the ambiguity in the Lease against JPMorgan, as the party that drafted the lease template. The construction-against-the-drafter rule is considered a rule of "last resort." *See Underwriters at Lloyds*, 882 F.3d at 1054 n.29 (declining to construe an ambiguous

---

critical. *See Bajrangi v. Magnethel Enters., Inc.*, 589 So. 2d 416, 419 n.5 (Fla. Dist. Ct. App. 1991) ("The distinction between latent and patent ambiguities in relation to parol evidence appears to be disappearing."); *Crown Mgmt. Corp.*, 452 So.2d at 51-52 (noting that "the growing and better reasoned trend of authority indicates that the introduction of parol evidence to probe the true intent of the parties is proper, irrespective of any technical classification of the type of ambiguity present.").

contract against the drafter because the construction-against-the-drafter rule applies "only after applying other rules of construction and considering extrinsic evidence"); *DSL Internet Corp. v. TigerDirect, Inc.*, 907 So. 2d 1203, 1205 (Fla. Dist. Ct. App. 2005) (under Florida law, "[t]he construction-against-the-drafter principle is a rule of last resort and is inapplicable when there is evidence of the parties' intent at the time they entered into the contract."). We have not yet reached the "last resort" stage in this appeal.

In sum, we vacate the final judgment and reverse the grant of summary judgment in favor of Cypress. We remand for the district court to consider and to make factual findings about the extrinsic evidence of the parties' intent. We leave to the district court's discretion whether additional discovery may be necessary on remand.

VACATED, REVERSED, AND REMANDED.