Badar v. Swissport USA, Inc.

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2022

(Argued: September 29, 2022; Decided: November 17, 2022)

Docket No. 21-1669
_____

CHAUDHRY BADAR, ALIA DAVARIAR, MUHAMMAD SHAFQAT, BALQEES BADAR,
BILAL BADAR,

Plaintiffs-Appellants,

v.

SWISSPORT USA, INC., PAKISTAN INTERNATIONAL AIRLINES,

Defendants-Cross Defendants-Appellees,

v.

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY,

Defendant-Cross Claimant.

_____

Before: JACOBS, BIANCO, and MENASHI, Circuit Judges.

Pakistan International Airlines ("PIA") failed to transport the body of

Nauman Badar to Pakistan for burial due to a miscommunication by employees

of Swissport USA, PIA's cargo loading agent.  Nauman Badar's family members sued PIA and Swissport in New York state court under state law; PIA removed the action to the United States District Court for the Eastern District of New York (Irizarry, J.).  Following cross-motions for summary judgment and an evidentiary hearing, the district court held that plaintiffs' claims are preempted by the Montreal Convention and dismissed the suit.  On appeal, plaintiffs argue that the Montreal Convention, which preempts state-law claims arising from delayed cargo, does not apply because human remains are not "cargo" for purposes of the Montreal Convention and because their particular claims are not for "delay."  We AFFIRM.

_____

ANNETTE G. HASAPIDIS, Hasapidis Law Offices, Ridgefield, CT (Jordan Merson, Merson Law, PLLC, New York, NY, on the brief), for Plaintiffs-Appellants.

JOHN MAGGIO, Condon & Forsyth LLP, New York, NY, for Defendant-Appellee Pakistan International Airlines.

GARTH AUBERT (Thomas Pantino, on the brief), Fitzpatrick & Hunt, Pagano, Aubert, LLP, New York, NY, for Defendant-Appellee Swissport USA, Inc.

DENNIS JACOBS, Circuit Judge:

When Nauman Badar died, his family arranged for Pakistan International Airlines ("PIA") to transport his body to Pakistan for burial in his ancestral home; but the body never made it onto the plane. After his remains were located, Nauman was buried in Maryland. The plaintiffs in this suit--Nauman's parents, brothers, and sister--sued PIA and its cargo loader, Swissport USA, Inc., for damages under state law. The district court dismissed on the ground of preemption by federal treaty: the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106–45, 2242 U.N.T.S. 309 (the "Montreal Convention").

The Montreal Convention sets forth a comprehensive liability regime governing "international carriage of persons, baggage or cargo performed by aircraft." Montreal Convention art. 1(1). The Convention preempts other civil claims within its scope. Id. art. 29. Among the injuries covered by the Convention is "damage occasioned by delay in the carriage by air of . . . cargo." Id. art. 19. On appeal, plaintiffs argue that the Montreal Convention does not apply because human remains are not "cargo" and because their claims arise from complete non-performance rather than "delay"--and that the district court

1

erred in granting summary judgment after a limited (and flawed) evidentiary hearing.

We affirm the judgment. Human remains are cargo for purposes of the Montreal Convention; and on the facts found by the district court, the claims arise from delay. The claims are therefore preempted by the Montreal Convention.

**I**

Beginning in 1933, the liability of international air carriers has been governed by international agreement rather than the local law of individual nations. Over the years, the comprehensive system of liability created by the Warsaw Convention (the Convention for the Unification of Certain Rules Relating to International Transportation by Air[1]) fragmented into a "hodgepodge of supplementary amendments and intercarrier agreements." Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 371 n.4 (2d Cir. 2004) (citation omitted). The result was a "patchwork of liability regimes around the world." Letter of Submittal, S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *6 ("Letter of Submittal").

---

[1] See Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, reprinted in note following 49 U.S.C. § 40105.

In 1999, the International Civil Aviation Organization convened a conference in Montreal to fix the Warsaw Convention and "creat[e] a modernized uniform liability regime for international air transportation." Id.; accord Cohen v. Am. Airlines, Inc., 13 F.4th 240, 244 (2d Cir. 2021). The resulting "Montreal Convention," which entered into force on November 4, 2003, e.g., Ehrlich, 360 F.3d at 372, hews closely to the text of its predecessor; accordingly, its "provisions may be analyzed in accordance with case law arising from substantively similar provisions of its predecessor, the Warsaw Convention." Cohen, 13 F.4th at 245.

The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft," Montreal Convention art. 1(1), and provides for passengers and shippers to recover for certain injuries, id. arts. 17–19. As relevant here, the Convention provides that "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo," id. art. 19, but caps recovery for such damage to cargo at a specified "sum of . . . Special Drawing Rights per kilogramme,"[2] id. art. 22(3). The Convention

---

[2] "Special Drawing Rights represent an artificial 'basket' currency developed by the International Monetary Fund for internal accounting purposes." Letter of Transmittal, S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *2. The current value of

does not, however, limit or preempt claims for total non-performance of a contract of carriage: a bald refusal to transport or a repudiation of the carriage contract is not "delay" for purposes of the Convention. See Wolgel v. Mexicana Airlines, 821 F.2d 442, 444 (7th Cir. 1987); In re Nigeria Charter Flights Cont. Litig., 520 F. Supp. 2d 447, 453 (E.D.N.Y. 2007); Paradis v. Ghana Airways Ltd., 348 F. Supp. 2d 106, 113–14 (S.D.N.Y. 2004), aff'd, 194 F. App'x 5 (2d Cir. 2006).

To achieve a uniform liability regime, the Montreal Convention, like the Warsaw Convention before it, preempts "all state law claims that fall within [its] scope." See Shah v. Pan Am. World Servs., Inc., 148 F.3d 84, 97–98 (2d Cir. 1998) (cleaned up); see also Cohen, 13 F.4th at 245 (recognizing that when a plaintiff's "claims fall under the Montreal Convention, . . . any remedy must be had pursuant to that Convention"). The self-executing Montreal Convention creates a federal cause of action for claims within its scope. See Baah v. Virgin Atl. Airways Ltd., 473 F. Supp. 2d 591, 593 (S.D.N.Y. 2007); see also S. Exec. Rep. No. 108–8, at 3 (2003) ("The Montreal Convention, like the Warsaw Convention, will provide the basis for a private right of action in U.S. courts in matters covered by

one SDR is $1.31. International Monetary Fund, SDR Valuation (updated Nov. 15, 2022), https://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

4

the Convention."). That federal cause of action is the *exclusive* means for pursuing such claims. "Where an action for damages falls within one of the Montreal Convention's three damage provisions, 'the Convention provides the sole cause of action under which a claimant may seek redress for his injuries.'" Seagate Logistics, Inc. v. Angel Kiss, Inc., 699 F. Supp. 2d 499, 505 (E.D.N.Y. 2010) (quoting Weiss v. El Al Isr. Airlines, Ltd., 433 F. Supp. 2d 361, 365 (S.D.N.Y. 2006)).

## II

Nauman Badar died suddenly in his apartment in Astoria, Queens. J.A. 341–42. His family decided to bury his remains in Pakistan, their ancestral home. E.g., J.A. 224–25, 314, 348–49, 1218. Accordingly, Nauman's brother Bilal Badar arranged for a funeral home, Muslim Funeral Services, to prepare the body for burial and arrange carriage to Pakistan. J.A. 344–46. In accordance with Islamic practice, the funeral home used no chemicals to preserve the body, which necessitated burial as fast as possible. See J.A. 223–24, 279. Nauman died on October 25, 2017; in consultation with Bilal, the funeral home arranged for transport of the remains aboard Pakistan International Airlines Flight 712, a

direct flight from New York to Lahore departing October 28, 2017. J.A. 224, 1219. Bilal purchased a ticket on the same flight. J.A. 1220.

On the day of departure, the funeral home delivered Nauman's body to JFK International Airport to be loaded onto Flight 712. J.A. 354. Bilal repeatedly sought and received confirmation from PIA employees that Nauman's body was on the plane. J.A. 1220–21. However, due to a miscommunication among Swissport's cargo loaders, J.A. 744, the pallet containing Nauman's body and the body of one other individual was not on board when the plane took off, e.g., J.A. 1260.

When Flight 712 landed in Lahore, Bilal met several relatives to claim the remains at PIA's Lahore cargo office. J.A. 363–64, 1224. There, the family learned that the body was not on the plane and that its whereabouts were unknown. J.A. 1224–25. For the next several hours, Bilal "called every single number [he] could find on the web" trying to discover what had happened to the remains, but he was unable to reach anyone at PIA in New York or to locate his brother's body. J.A. 1241; see also J.A. 369, 1225. Around dawn in Lahore the following day, a text message from the funeral home informed Bilal that

Nauman's body had been located at JFK and that the funeral home had taken custody of the body and placed it in cold storage. J.A. 1227–28.

The family debated what to do next and decided to bury Nauman in the United States in order "[t]o get him to a final resting place as soon as possible." J.A. 378 (Bilal Dep.); see also J.A. 384. Bilal then booked seats for himself and his brother and father on the next flight to New York. Back in the United States, Bilal instructed the funeral home to transport Nauman's body to a cemetery near Bilal's Maryland home, and the three men conducted a burial ceremony there on November 1, 2017. J.A. 385–86, 1231.

This litigation began in October 2018: Nauman's brothers Bilal Badar and Muhammad Shafqat, his sister Alia Davariar, and his parents Chaudhry and Balqees Badar filed suit in New York state court against PIA, Swissport, and the Port Authority of New York and New Jersey. Notice of Removal ¶ 1, Badar v. Swissport USA Inc., No. 18-6390 (E.D.N.Y. Nov. 9, 2018), Dkt. No. 1. They alleged state-law claims arising from the failure to transport Nauman's body on PIA Flight 712, including loss of right of sepulcher, negligence, negligent infliction of emotional distress, and breach of contract. Id., Ex. A. PIA, which is majority-owned by the Pakistani government and therefore qualifies as a

7

"foreign state" under federal law, removed the suit to federal court pursuant to 28 U.S.C. § 1441(d). Id. ¶ 4. At no time have plaintiffs pled a claim under the Montreal Convention.

After completion of discovery, plaintiffs voluntarily dismissed all claims against the Port Authority. J.A. 9. The remaining defendants, PIA and Swissport, moved for summary judgment on the ground of preemption under the Montreal Convention. J.A. 141–61. Plaintiffs cross-moved for summary judgment and to strike affirmative defenses, arguing that the Montreal Convention does not apply because human remains are not "cargo" and because their claims are for non-performance rather than "delay." J.A. 791–803.

The district court denied both motions. Badar v. Swissport USA, Inc., 492 F. Supp. 3d 54 (E.D.N.Y. 2020). The court held that human remains are "cargo" under the Montreal Convention, id. at 59–62, but concluded that "there is insufficient evidence to enable [it] to decide," id. at 65, whether plaintiffs' claims arose from delay or from non-performance because it was "unclear whether Plaintiffs chose to secure substitute travel for the decedent's remains or whether Defendants offered alternate transportation for the remains," id. at 63–64. Since this issue was "a fact essential to determining the preemptive effect of Article 19

8

of the Montreal Convention," the court ordered "an evidentiary hearing . . . to develop the necessary facts to determine this threshold issue." Id. at 64–65.

That hearing was conducted via video teleconference on February 10, 2021. J.A. 16, 1197. Bilal Badar testified that "there was no communication from PIA" and denied that PIA "ever offer[ed] [the family] an alternative when [his] brother's body was not initially transported to Pakistan," J.A. 1232. His only contact with PIA, Bilal testified, consisted of a brief phone call several days after Nauman's funeral. J.A. 1231–32; see also J.A. 387 ("I received a call from [PIA] . . . . There was just [']I'm with PIA, this is what happened,['] that's pretty much it.").

PIA employee Paulette Cottone offered competing testimony that PIA promptly offered to transport Nauman's body to Pakistan on an Emirates flight but that the Badar family declined. J.A. 1261. She based this testimony both on her own "aware[ness] of everything that was going on" in PIA's New York office on the day in question, J.A. 1263, and on the fact that the family of the *other* decedent left off Flight 712 received and accepted an offer of substitute transportation, J.A. 1261, 1267, 1269. Defendants also argued that Ms. Cottone's testimony was consistent with an affidavit submitted by PIA employee Arbab

9

Hibatullah, J.A. 136–37, and with a contemporaneous email by Ms. Cottone's supervisor, Naseem Alavi, in which Mr. Alavi told a Swissport representative that "[t]he bodies will now be transported to Pakistan by some other carrier," J.A. 742. See J.A. 1272–75.

The district court credited Ms. Cottone's testimony while concluding that plaintiffs' "categorical[] den[ial] that PIA ever made an offer of alternative transportation" was "not credible." Badar v. Swissport USA, Inc., Civ. A. No. 18-6390, 2021 WL 2382444, at *3 (E.D.N.Y. June 10, 2021). The email from Mr. Alavi was cited as corroboration of Ms. Cottone's testimony. Id. The evidentiary hearing thus "provided sufficient evidence to conclude that PIA had offered alternate transportation for Nauman Badar's remains." Id.

On the basis of this factual finding, the district court held that PIA's conduct "did not constitute a complete nonperformance of contract because Plaintiffs did not afford PIA an opportunity to transport the remains using alternate transportation." Id. at *4. Therefore, it concluded, the claims arise from delay, such that "Article 19 of the Montreal Convention applies and preempts Plaintiff[s'] breach of contract claim." Id. The action was dismissed on June 10, 2021.

Plaintiffs timely appeal. J.A. 17. They argue that the Montreal Convention does not apply because human remains are not "cargo" (see Section III), and because their claims arose from non-performance (Section IV).

## III

Whether the Montreal Convention applies to the international transportation of human remains is a question of first impression in this Court.

The scope of the Montreal Convention is a matter of treaty interpretation, which we review de novo. Fed. Republic of Nigeria v. VR Advisory Servs., Ltd., 27 F.4th 136, 148 (2d Cir. 2022). "When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used." Cohen, 13 F.4th at 245 (quoting Ehrlich, 360 F.3d at 375). "The main task of any tribunal which is asked to . . . interpret a treaty is to give effect to the expressed intention of the parties, that is, their intention as expressed in the words used by them in the light of the surrounding circumstances." Mora v. New York, 524 F.3d 183, 193–94 (2d Cir. 2008) (internal quotation marks, citation, alterations, and emphasis omitted). "Because a treaty ratified by the United States is not only the law of this land but also an agreement among sovereign powers, [courts] have traditionally considered as aids to its interpretation the negotiating and drafting

11

history . . . and the postratification understanding of the contracting parties." El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 167 (1999) (internal citation omitted); accord Georges v. United Nations, 834 F.3d 88, 92–93 (2d Cir. 2016).

As the district court observed, "while the Montreal Convention itself does not define 'cargo,' the term is generally defined to encompass any load conveyed by a vessel." Badar, 492 F. Supp. 3d at 62. Dictionary definitions confirm that the fact of transportation is the essential quality of "cargo," not any intrinsic characteristic of that which is transported. See Cargo, Black's Law Dictionary (11th ed. 2019) ("Goods transported by a vessel, airplane, or vehicle"); Cargo, Merriam-Webster's Unabridged Dictionary (last accessed Nov. 15, 2022) ("the lading or freight of a ship, airplane, or vehicle: the goods, merchandise, or whatever is conveyed"); Cargo, Oxford English Dictionary (2d ed. 1989) ("the freight or lading of a ship").

Plaintiffs urge a narrower definition, that "cargo" refers only to "commercial products" or other items to which society attaches no special significance. See Appellants' Br. at 27; Appellants' Reply Br. at 7. But while raw materials or commercial goods may be paradigmatic examples, the word cargo is not so limited. It likewise applies to items invested with emotional, aesthetic,

cultural, or religious value.  A corpse, which may be precious and venerated, may still be deemed cargo when transported by air.

The designation of human remains as cargo should not be surprising to carriers or consignors.  The four major U.S. airlines ship human remains through their cargo departments.[3]  Nauman Badar's body was to be loaded into the plane's *cargo* hold by a "*cargo* handling agent," J.A. 547–48; Bilal Badar went to the "*cargo area* to sign for and collect Nauman" in Lahore, J.A. 1224 (testimony of Bilal Badar); and the transportation of the remains was arranged via air waybill, a type of document used exclusively in the shipment of cargo.  J.A. 138–39.  Plaintiffs assert that PIA "does not treat human remains as ordinary cargo," Appellant's Br. at 29, but their main support is a statement from the airline's "*Cargo* Handling Manual," J.A. 745.

An inclusive reading of "cargo" is especially appropriate here.  Whereas the Warsaw Convention referenced "passengers, baggage, *and goods*," Warsaw

---

[3] See American Airlines Cargo, <u>Products</u>, https://www.aacargo.com/ship/products.html (last visited Nov. 15, 2022); Delta Cargo, <u>Specialized Care</u>, https://www.deltacargo.com/Cargo/catalog/products/specialized-care (last visited Nov. 15, 2022); United Cargo, <u>TrustUA</u>, https://www.unitedcargo.com/en/us/products/trustua.html (last visited Nov. 15, 2022); Southwest Cargo, <u>Human Remains</u>, https://www.swacargo.com/swacargo_com_ui/learn/specialty-shipments/human-remains (last visited Nov. 15, 2022).

Convention art. 1(1) (emphasis added), the Montreal Convention uses the term "cargo" (which, if anything, is more expansive),[4] implying that the Montreal Convention applies to more than commercial goods.[5]  Interpreting "cargo" to include human remains is also consistent with the purposes of the Convention. Like the Warsaw Convention before it, the principal aim of the Montreal Convention is "to achieve uniformity of rules governing claims arising from international air transportation."  El Al Isr. Airlines, 525 U.S. at 169 (cleaned up; internal quotation marks and citation omitted); accord Letter of Submittal at *9. The Convention should therefore be read to avoid lacunae in coverage and promote uniform rules of liability.  See Onyeanusi, 952 F.2d at 793.  Excluding items "not readily viewed as [cargo]," Johnson, 834 F.2d at 723, would impair that uniformity.  The drafters of the Convention created a single exemption for

---

[4] The English version of the Montreal Convention is an "authentic" text of the Convention, Montreal Convention, final clause, so courts may rely on the Convention's English terms without recourse to any another language, e.g., Elmar Giemulla, Final Clause, in Montreal Convention at Final Clause-1 (Elmar Giemulla & Ronald Schmid eds., 2017). Cf. Vienna Convention on the Law of Treaties art. 33(1), May 23, 1969, 1155 U.N.T.S. 331 ("When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language . . . .").  The Court therefore need not interpret "cargo" to match the (slightly different) word used in the French text: "marchandises."

[5] Even prior to the adoption of the term 'cargo' in the Montreal Convention, the Third and Ninth Circuits had held that human remains qualified as 'goods' under the Warsaw Convention.  See Johnson v. Am. Airlines, Inc., 834 F.2d 721, 723 (9th Cir. 1987); Onyeanusi v. Pan Am., 952 F.2d 788, 791–93 (3d Cir. 1992).

14

objects otherwise classifiable as cargo: "postal items."  See Montreal Convention art. 2.  Courts should not create more.

Finally, plaintiffs observe that Article 22's limitations on liability are calculated based on the weight of the "cargo," and they argue that weight-based liability for human remains would produce an "absurd result in conflict with society's mores."  Appellants' Br. at 38; see also Christopher Ogolla, Death Be Not Strange: The Montreal Convention's Mislabeling of Human Remains as Cargo and Its Near Unbreakable Liability Limits, 124 Dick. L. Rev. 53, 89–90 (2019) (making a similar argument).  In this particular situation, valuation based on weight may be insensitive, macabre, or even opposed to our better nature, but it is not absurd: the Convention itself mitigates any potential absurdity.  Article 22's weight-based limitation is a default rule, and consignors and carriers may opt out: the default cap does not apply if the consignor "has made . . . a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires," in which event "the carrier will be liable to pay a sum not exceeding the declared sum."  Montreal Convention art. 22(3).  It is "an exceptionally rare occurrence" for "the text [to] produce[] a manifestly absurd result."  In re Dubroff, 119 F.3d 75, 76 (2d Cir. 1997).  This is not such a case.

We hold that human remains are properly considered "cargo" for purposes of the Montreal Convention and that the Convention therefore applies to the international transportation of human remains by air.

**IV**

Plaintiffs' second argument is that their claims are outside the ambit of the Montreal Convention because they arise from non-performance rather than "delay." Following an evidentiary hearing, the district court found that plaintiffs did not accept PIA's offer to belatedly transport Nauman Badar's body to Pakistan, concluded that plaintiffs' claims arise from delay, and held that they are therefore preempted. We affirm both the district court's factual finding and its analysis.

**A**

At the outset, plaintiffs challenge the district court's decision to conduct an evidentiary hearing and make findings of fact following denial of the parties' summary judgment motions. But plaintiffs had sufficient notice that an evidentiary hearing (rather than a bench trial) would be used to "develop the necessary facts" and to "determine this threshold [preemption] issue," Badar, 492 F. Supp. 3d at 65; they did not object to that course of action, J.A. 1160–62, 1181.

16

Accordingly, we review only for plain error.  E.g., Pescatore v. Pan Am. World

Airways, Inc., 97 F.3d 1, 18 (2d Cir. 1996).

"On plain error review, this court will only grant relief if there was (1)

error, (2) that is plain, (3) that affects substantial rights, and (4) the error seriously

affects the fairness, integrity, or public reputation of judicial proceedings."

Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 237 (2d Cir. 2020) (internal

quotation marks and citation omitted); cf. Fed. R. Civ. P. 61 ("At every stage of

the proceeding, the court must disregard all errors and defects that do not affect

any party's substantial rights.").  Even if it be error to make factual findings

regarding preemption in the context of an evidentiary hearing (rather than a

formal bench trial), and even if such an error was plain, plaintiffs cannot show

any effect on their substantial rights.  As plaintiffs concede, if we were to

remand, it would still be the district judge, not a jury, that would decide the

facts.  See Appellant's Br. at 16 n.3; 28 U.S.C. § 1441(d) ("Upon removal [by a

foreign state] the action shall be tried by the court without jury.").  And although

plaintiffs have identified several omitted formalities, Appellants' Reply Br. at 2–

3, nothing suggests that the district court would make a different finding after a

17

full bench trial.  Plaintiffs therefore cannot show plain error in procedure, and we move on to their substantive challenges.

**B**

When a district court resolves a factual dispute in the course of determining a legal issue, this Court reviews factual findings for clear error and legal conclusions de novo.  See, e.g., Fisher v. Aetna Life Ins. Co., 32 F.4th 124, 135 (2d Cir. 2022) (contract formation); Daou v. BLC Bank, S.A.L., 42 F.4th 120, 133 (2d Cir. 2022) (foreign sovereign immunity); Tapia v. BLCH 3rd Ave LLC, 906 F.3d 58, 61 (2d Cir. 2018) ("employer" status under the FLSA); In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 40–41 (2d Cir. 2006) (Rule 23 criteria for class certification).  "A finding of fact is clearly erroneous when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Fisher, 32 F.4th at 136 (internal quotation marks and citation omitted).  "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Mango v. BuzzFeed, Inc., 970 F.3d 167, 170 (2d Cir. 2020) (quoting United States v. Williams, 943 F.3d 606, 610 (2d Cir. 2019)).  An appellate court owes particular deference to credibility determinations: "[W]hen

18

a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. City of Bessemer, 470 U.S. 564, 575 (1985); see also Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

The disputed factual finding--that PIA offered plaintiffs alternate transportation for the remains--was not clear error. Although Bilal Badar "categorically den[ied] that PIA ever made an offer of alternative transportation," Badar, 2021 WL 2382444, at *3; see J.A. 1232, the district court deemed this denial "not credible," 2021 WL 2382444, at *3. Instead, the court credited the testimony of Paulette Cottone, an employee at PIA's JFK office, who testified that PIA promptly offered to transport the body to Pakistan, via an Emirates flight. Id.; see J.A. 1261. Ms. Cottone relied heavily on the fact that PIA made this offer with respect to the other body left on the tarmac: "It's not possible [that PIA offered alternate transport to the other family but not the Badars.] . . . PIA would not behave that way. . . . [W]e would not make an offer to

19

one and not the other." J.A. 1269; accord J.A. 1267; see also J.A. 137 (affidavit of Arbab Hibatullah) ("Alternative travel arrangements were made by PIA to transport the remains of the other deceased party to Pakistan the next day.").

Plaintiffs argue that the district court should have excluded Ms. Cottone's testimony, which they characterize as hearsay. See Appellants' Br. at 21–23, 25, 40–42. However, Ms. Cottone's testimony was corroborated in important respects by other evidence.[6] And rejection of alternative transport to Pakistan is consistent with plaintiffs' desire "[t]o get [Nauman] to a final resting place as soon as possible." J.A. 378 (Bilal Dep.). In any event, plaintiffs failed to make a hearsay objection at the evidentiary hearing (notwithstanding that counsel

---

[6] In a message to PIA staff in Lahore on October 30, PIA employee Arbab Hibatullah stated that "[w]e are in contact with Mr. Bilal[, b]rother of Nauman Badar . . . and informed [him] that [the b]odies have been transferred to [Muslim Funeral Services] who . . . will now book [transportation] on any other carrier's first available [flight]. Both the families accepted this and are also in contact with [Muslim Funeral Services]." J.A. 736. Later that day, Naseem Alavi, PIA's U.S. country manager, J.A. 742, wrote that he had "personally contacted families of both [decedents] and informed them about the situation. They agreed with the arrangements and are also in communication with [the] Funeral Home." J.A. 729. And in an email cited by the district court, Mr. Alavi told a Swissport manager that "[t]he bodies will now be transported to Pakistan by some other carrier." J.A. 742. Finally, Ms. Cottone's testimony aligns with Mr. Hibatullah's affidavit, which stated that he had been "informed that the Badar family decided not to transport decedent's remains to Pakistan, but rather intended to have a burial in the United States." J.A. 137.

20

interposed such objections at other points).[7]  Instead, plaintiffs' counsel elected to

attack Ms. Cottone's testimony on cross-examination.  See J.A. 1264–66.  Our

review of the admissibility of Ms. Cottone's testimony is therefore limited to

plain error.  E.g., United States v. Miller, 954 F.3d 551, 562 (2d Cir. 2020).

Though framed as hearsay, the thrust of the argument is that the witness

lacked personal knowledge.  Ms. Cottone testified that she "did the clerical

preparation of everything for [Flight 712]," J.A. 1259, and that she "was aware of

everything that was going on" due to her position as secretary to Mr. Alavi,

PIA's country manager at JFK, J.A. 1263–64.  This testimony does not

demonstrate direct, personal knowledge of PIA's offer to the Badars.  But

whether or not it was error to receive Ms. Cottone's testimony, and even if such

error was plain, the failure to exclude her testimony sua sponte did not affect

plaintiffs' substantial rights given the corroborating evidence, nor did it

"seriously affect[] the fairness, integrity, or public reputation of judicial

---

[7] Plaintiffs did object below, but only on the ground that Ms. Cottone "was not identified on defendants' Rule 26a disclosures, nor in their interrogatory responses as a witness with knowledge in this case."  J.A. 1181.  Obviously, this is not an objection to hearsay; moreover, plaintiffs only made it on the eve of the hearing, leading the district court to overrule it as "waived and untimely."  J.A. 15 (Minute Order, Jan. 27, 2021).

proceedings." Yukos Cap., 977 F.3d at 237 (internal quotation marks and citation omitted).

Having thus rejected the procedural challenge (as not *plain* error), we conclude that the district court's finding itself was not *clear* error. The inference Ms. Cottone drew from the other evidence in the record--that PIA offered transportation to the Badars because it did so to the other affected family--is a strong one; it was not unreasonable for the district court to adopt it. See Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 44 (2d Cir. 2000) ("Decisions as to . . . which of competing inferences to draw are entirely within the province of the trier of fact.") (citing Anderson, 470 U.S. at 573–75). The district court's finding was not clear error.

## C

Given this finding, we conclude that plaintiffs' claims are for "damage occasioned by delay in the carriage by air of . . . cargo." Montreal Convention art. 19. As several district courts in this Circuit have held, a passenger or shipper who refuses an offer of delayed transportation, or who makes alternative arrangements, may not assert a claim for complete non-performance. E.g., Vumbaca v. Terminal One Grp. Ass'n L.P., 859 F. Supp. 2d 343, 366 (E.D.N.Y.

22

2012) (Weinstein, J.) ("Article 19 applies . . . [when a passenger] books an alternative flight without affording the airline an opportunity to perform its obligations[.]"); In re Nigeria Charter Flights Cont. Litig., 520 F. Supp. 2d 447, 453–54 (E.D.N.Y. 2007) (Dearie, J.) ("In some [cases found to arise from delay] . . . . plaintiffs either secured alternate transportation without waiting to find out whether the defendant airlines would transport them or refused an offer of a later flight." (internal citations omitted)).  One may not "convert a mere delay into contractual non-performance by choosing to obtain [alternative] conveyance."  Paradis v. Ghana Airways Ltd., 348 F. Supp. 2d 106, 112–14 (S.D.N.Y. 2004) (Stein, J.) (collecting cases "refus[ing] to allow recovery for breach of contract when plaintiffs responded to delays . . . by booking alternative flights"), aff'd, 194 F. App'x 5 (2d Cir. 2006).  Plaintiffs appear to concede as much.  Appellants' Br. at 39 ("[I]f [PIA] had made the offer [of alternative transportation], then the Convention preempt[s] Plaintiffs' claims.").

The air waybill in this case required PIA only to "complete the [c]arriage with reasonable dispatch," J.A. 759; that obligation had not been breached at the time the Badars decided to bury Nauman in the United States.  See Paradis, 348 F. Supp. 2d at 112 (noting that an airline which had offered replacement

23

transportation one week later "had not failed to perform its contract obligations" because the plaintiff's ticket required the airline only to "carry the passenger and baggage with reasonable dispatch"). It was plaintiffs who cut off PIA's ability to perform under the terms of the waybill. That decision was understandable given the need to bury Nauman quickly, and it cannot be doubted that plaintiffs found themselves in a hard situation. But their only recourse against PIA and Swissport was a claim under the Montreal Convention, a claim which they have consistently declined to assert.

*     *     *

We AFFIRM the district court's judgment dismissing plaintiffs' claims as preempted by the Montreal Convention.