*Indem. Ins. Co. of N. Am. v. Unitrans Int'l Corp.*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued: October 7, 2022
Decided: April 4, 2024

No. 21-2132

INDEMNITY INSURANCE COMPANY OF NORTH
AMERICA,

*Plaintiff-Appellant*,

*v.*

UNITRANS INTERNATIONAL CORPORATION,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of New York
No. 17-cv-4718, Cheryl L. Pollak, *Magistrate Judge*.

Before:     LYNCH, CHIN, and SULLIVAN, *Circuit Judges*.[*]

---

[*] Judge Rosemary S. Pooler, originally a member of the panel that heard oral argument in this case, passed away on August 10, 2023. Judge Gerard E. Lynch was selected at random to complete the panel. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

Indemnity Insurance Company of North America ("Indemnity") appeals from the district court's grant of summary judgment in favor of Unitrans International Corporation ("Unitrans") on Indemnity's subrogated claims for damage to cargo that occurred while the cargo was being unloaded from a truck at an airport. The district court (Pollak, *M.J.*) granted Unitrans's motion for summary judgment on the grounds that Unitrans – a logistics company – qualified as a contracting carrier under the Montreal Convention and that Indemnity's action was therefore time-barred by the Convention's statute of limitations. Although we agree that contracting carriers are subject to the Montreal Convention, we find that there is a genuine dispute of material fact as to whether Unitrans was a contracting carrier. Accordingly, we **VACATE** the judgment and **REMAND** the case for further proceedings.

VACATED AND REMANDED.

> JUSTIN M. HEILIG (Casey M. O'Brien, *on the brief*), Hill Rivkins LLP, New York, NY, *for Plaintiff-Appellant*.
>
> JOHN ALAN ORZEL (Mariya Joldzic, *on the brief*), Kennedys CMK LLP, New York, NY, *for Defendant-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

In July 2014, Amgen, Inc. ("Amgen"), subrogor of plaintiff-appellant Indemnity Insurance Company of North America ("Indemnity"), engaged defendant-appellee Unitrans International Corporation ("Unitrans") to arrange for the transportation of three pallets of Enbrel, a pharmaceutical drug (the "Cargo"), by motor and air carriage from Amgen's facility in Dublin, Ireland to Philadelphia. On July 28, 2014, while Unitrans's agent was delivering the Cargo

2

to the air carrier at the airport, one of the pallets fell and was damaged. As a consequence, the entire shipment was returned to Amgen's facility in Dublin, and the damaged pallet was declared a total loss.

Indemnity, as Amgen's insurer, paid Amgen's claim for the loss of the pallet and, as subrogee to Amgen's rights, sued Unitrans for breach of contract, negligence, and breach of bailment. Unitrans moved for summary judgment, arguing that the Montreal Convention – which preempts all state law claims within its scope – governed Amgen's claim. *See* Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, T.I.A.S. 13038, 2242 U.N.T.S. 309 (entered into force Nov. 4, 2003) ("Montreal Convention"). The United States District Court for the Eastern District of New York (Pollak, *M.J.*) granted summary judgment in Unitrans's favor, concluding that the Montreal Convention applied and that the action was therefore barred by its two-year limitations period. This appeal followed.

Though we hold that the Montreal Convention applies to contracting carriers, we find that there remains a genuine factual dispute as to whether Unitrans qualifies as a contracting carrier. Accordingly, we **VACATE** the judgment of the district court and **REMAND** the case for further proceedings.

3

## I. BACKGROUND

### A. Facts

Amgen is a manufacturer and seller of pharmaceutical products, and Unitrans is a logistics company that arranges for the shipment of cargo by using the services of third-party carriers, such as truckers, airlines, and ship lines.[1] Amgen and Unitrans's relationship was generally governed by two agreements – a Master Terms and Conditions Agreement that was entered into in 2002 and a Quality Agreement that took effect in 2014. From time to time, Amgen would engage Unitrans to arrange for the shipment of its goods by contacting Multi Cargo Limited ("MCL"), Unitrans's agent in Ireland, with the particulars and desired schedule of the shipment.

On June 30, 2014, Amgen contacted MCL in Dublin by email to "organi[z]e" the "booking" of two commercial shipments of Enbrel from "ADL to PCI" – that is, from "ADL," referring to Amgen's facility in Dun Laoghaire, Dublin, Ireland to "PCI," a company in Philadelphia called Packaging Co-ordinators Inc. that was listed as the "[u]ltimate [c]onsignee" for the shipments. J. App'x at 266, 268, 271.

---

[1] Because the district court granted summary judgment in favor of Unitrans, we construe the evidence in the record in the light most favorable to Indemnity. *See Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 182 (2d Cir. 2022).

One of these shipments was the Cargo. The email did not specify the airline or carriers to be used. On July 2, 2014, MCL responded by email, confirming the bookings, including the booking of the Cargo. MCL's email confirmed that air carriage had been booked for the Cargo to be picked up on July 28, 2014 from ADL and to depart from Dublin to Philadelphia on July 29, 2014 via US Airways under an air waybill (AWB: 037-49058936) that was ultimately issued on July 28, 2014.[2] The air waybill, which was issued and signed by an agent of MCL, identified the shipper as Amgen and the consignee as Immunex Rhode Island Corporation ("Immunex").[3] Subsequent emails confirmed these arrangements for the Cargo. The agreement provided for "the door to door carriage of the [C]argo." *Id.* at 81.

MCL appointed Transport & Logistic Concepts Ltd. ("TLC"), a motor carrier, to pick up the Cargo from Amgen's facility, drive it to Dublin Airport, and deliver it to the air carrier's ground handling agent for shipment via air carriage

---

[2] A "waybill" is "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods. . . . A waybill ordinarily records where the goods [are] being sent, how much they are worth, and how much they weigh." *Waybill*, Black's Law Dictionary (11th ed. 2019). An "air waybill" is specifically "[a] waybill for transportation of cargo by air." *Id.* Article 4(1) of the Montreal Convention provides that "[i]n respect of the carriage of cargo, an air waybill shall be delivered." Montreal Convention art. 4(1).

[3] Although the air waybill states at the top that it was "[i]ssued by" US Airways in Arlington, Virginia, it was signed by Irene Grealy for MCL in Dublin. J. App'x at 112. The air waybill lists MCL in Dublin as the "Issuing Carrier's Agent," as well as the agent of the shipper, Amgen. *Id.* Immunex was located in Rhode Island, and PCI was apparently Immunex's agent in Philadelphia.

to Philadelphia. On July 28, 2014, a TLC driver picked up the Cargo from Amgen's facility, drove to MCL's office to retrieve the air waybill and other documentation, and then drove to Dublin Airport.

At Dublin Airport, while the TLC driver was removing the Cargo from the truck to deliver it to US Airways's ground handling agent, one pallet fell off the truck and was damaged. The Cargo was returned to Amgen's facility, and the damaged pallet was declared a total loss of over $1.8 million. Indemnity paid Amgen's claim for the total loss and became fully subrogated to Amgen's rights.

## B. Procedural History

On September 21, 2016 – more than two years after the incident occurred – Indemnity sued Unitrans in New York state court for breach of contract, negligence, and breach of bailment. On August 11, 2017, Unitrans removed the case to the Eastern District of New York. The parties consented to jurisdiction by Magistrate Judge Pollak over all further proceedings in the case. Unitrans moved for partial summary judgment, and Indemnity cross-moved for partial summary judgment.

On September 30, 2019, the district court granted Unitrans's motion for partial summary judgment, concluding that the Montreal Convention applied to Indemnity's claims. Indemnity moved for reconsideration, arguing that the

6

district court overlooked portions of the Montreal Convention. On February 4, 2020, the district court denied the motion.

On March 5, 2020, Indemnity requested that the district court certify its September 30, 2019 decision for interlocutory appeal to this Court in order to review the district court's interpretation of the Montreal Convention. The district court denied that request on November 30, 2020. On February 1, 2021, Unitrans filed a second motion for summary judgment, arguing that Indemnity's complaint should be dismissed as untimely under the Montreal Convention's two-year statute of limitations.[4] On August 5, 2021, the district court granted the motion. Judgment was entered on August 9, 2021. This appeal followed.

## II.    DISCUSSION

We review a district court's decision on a motion for summary judgment *de novo*. *See Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 182–83 (2d Cir. 2022). "We affirm only if there is no genuine issue of material fact and the prevailing party was entitled to judgment as a matter of law, but summary judgment must be rejected if the evidence is such

---

[4] Article 35 of the Montreal Convention provides: "The right to damages shall be extinguished if an action is not brought within a period of two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped." Montreal Convention art. 35(1).

7

that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 183

(citations and internal quotation marks omitted). Additionally, we review the

scope of the Montreal Convention, which is a matter of treaty interpretation, *de*

*novo*. *See Badar v. Swissport USA, Inc.*, 53 F.4th 739, 746 (2d Cir. 2022).

The principal legal issue presented is whether the Montreal Convention

applies only to damage that occurs while cargo is in the charge of an actual carrier.

Indemnity urges us to adopt this narrow construction of the Montreal Convention,

which would place its claims outside of the Convention given that Unitrans merely

arranged for the Cargo's transportation through third-party carriers and was not

itself an actual carrier. We reject Indemnity's legal argument and hold that the

Montreal Convention extends to "contracting carriers" when cargo is damaged in

international carriage while in their charge. Nevertheless, because there remains

a genuine factual dispute over whether Unitrans qualifies as a "contracting

carrier," we conclude that the district court should not have granted Unitrans's

motion for summary judgment.

## A.     The Interpretation of Treaties

"When interpreting a treaty, we begin with the text of the treaty and the

context in which the written words are used." *Id.* (internal quotation marks

omitted). If the words of the treaty "are reasonably susceptible of only one

8

interpretation, our task of interpretation ends there." *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 375 (2d Cir. 2004) (internal quotation marks omitted); *see also Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 457 (2d Cir. 2003) ("Where the language of . . . an international treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty."). But "when a treaty is reasonably susceptible to more than one interpretation, secondary sources must be employed to ascertain appropriate meaning." *Com. Union Ins. Co.*, 347 F.3d at 457. The Supreme Court has traditionally considered "negotiating and drafting history" a useful aid for interpreting an otherwise ambiguous treaty. *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999) (internal quotation marks omitted); *accord Badar*, 53 F.4th at 747. "In so doing, we strive to conform our reading to the treaty's original intent and purpose." *Com. Union Ins. Co.*, 347 F.3d at 457.

## B.     The Montreal Convention

The Montreal Convention "applies to all international carriage of persons, baggage[,] or cargo performed by aircraft." Montreal Convention art. 1(1). It was drafted in 1999, when "the International Civil Aviation Organization convened a conference in Montreal to fix the [then-operative] Warsaw Convention and create a modernized uniform liability regime for international air transportation." *Badar*,

53 F.4th at 743 (alterations and internal quotation marks omitted). As relevant here, Article 18 of the Convention, which covers damage to cargo, provides that a carrier is liable for damage to cargo if "the event which caused the damage . . . took place during the carriage by air." Montreal Convention art. 18(1). "[C]arriage by air . . . comprises the period during which the cargo is in the charge of the carrier." *Id.* art. 18(3). Significantly, "carriage by air" can encompass periods when the cargo is not "actually aboard an airplane," *Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1040 (11th Cir. 2018), but does not cover "carriage by land . . . performed outside an airport," Montreal Convention art. 18(4); *see also Underwriters at Lloyds*, 882 F.3d at 1040.

Most of the Montreal Convention's provisions, including Articles 18(1) and 18(3), were carried over from its predecessor treaty, the Warsaw Convention. The Montreal Convention's text "hews closely" to that of its predecessor and may therefore be analyzed according to case law arising from similar provisions in the Warsaw Convention. *Badar*, 53 F.4th at 744. Chapter V (Articles 39 to 48) of the Montreal Convention, however, was newly added in 1999 and reflects the essential terms of the Guadalajara Convention, which was held in 1961

> for the limited purpose of supplementing the Warsaw Convention to address indirect carriage of cargo. In operations involving indirect

carriage of cargo, a consignor purchases transportation from one carrier, such as an air freight forwarder or consolidator ("the contracting officer"), but the transportation is provided by another carrier (the "actual carrier"), in accordance with an agreement between the carriers.

S. Treaty Doc. No. 106-45, at vi (2000), *reprinted in* 1999 WL 33292734, at *3.

Historically, cases interpreting the Warsaw Convention concluded that "carrier" applied only to the airline carrying out the transportation. *See Pflug v. Egyptair Corp.*, 961 F.2d 26, 31 (2d Cir. 1992) ("Although the term 'carrier' is not defined in the [Warsaw] Convention, the manner in which it is employed . . . makes clear that the [Warsaw] Convention's drafters were referring only to those airlines that actually transport passengers or baggage ('actual carriers')." (quoting *Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1103 (D.C. Cir. 1988))); *see also Best v. BWIA W. Indies Airways Ltd.*, 581 F. Supp. 2d 359, 362–63 (E.D.N.Y. 2008) (collecting cases).

Chapter V of the Montreal Convention, however, extended liability to other carriers – "contracting carriers" – which provide "indirect carriage of cargo." *See* S. Treaty Doc. No. 106-45, at vi, *reprinted in* 1999 WL 33292734, at *3. Article 39 defines "contracting carrier" as a carrier that takes on the role of a principal in carrying out the transport, even if it does not perform the actual transport itself:

11

The provisions of [Chapter V] apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage.

Montreal Convention art. 39. Though the Montreal Convention does not further define "contracting carrier," the President included a "detailed article-by-article analysis" of its text – prepared by the Secretary of State – when transmitting the treaty to the Senate. *See* Cong. Rsch. Serv., *Treaties and Other International Agreements: The Role of the United States Senate* 118 (2001) (explaining how "[a]ll treaties are transmitted to the Senate in the President's name" and are typically accompanied by a letter from the Secretary of State that provides a "detailed description and analysis of the treaty"), https://www.govinfo.gov/content/pkg/CPRT-106SPRT66922/pdf/CPRT-106SPRT66922.pdf [https://perma.cc/JX6P-CX4W]. This analysis of Article 39 clarifies that "contracting carrier" liability extends to indirect carriage arrangements:

[A] contracting carrier/actual carrier operation . . . includes code-share operations[5] and operations where one carrier offers service using an aircraft and crew leased from another carrier. Under this Chapter, a passenger or consignor, or an agent thereof, could bring

---

[5] "Code sharing is an arrangement in which an airline sells a ticket under its name and code number, but the flight itself is operated by another airline." *Best*, 581 F. Supp. 2d at 364.

12

suit against the carrier performing the relevant carriage or against the carrier with which they contracted for the carriage.

S. Treaty Doc. No. 106-45, at 21, *reprinted in* 1999 WL 33292734, at *25.

In addition, Article 40, which explains the respective liability of contracting and actual carriers, provides:

> If an actual carrier performs the whole or part of carriage which, according to the contract referred to in Article 39, is governed by this Convention, both the contracting carrier and the actual carrier shall, except as otherwise provided in this Chapter, be subject to the rules of this Convention, the former for the whole of the carriage contemplated in the contract, the latter solely for the carriage which it performs.

Montreal Convention art. 40; *see also id.* art. 1(4).

Taken together, these provisions make clear that a "contracting carrier" – that is, a company that arranges for the international transportation of cargo by engaging third-party carriers such as airlines and truckers to perform the actual carriage – is a "carrier" for purposes of the Montreal Convention if, as a principal, it enters into the contract of carriage with a consignor.[6]

Indemnity argues that "in the charge of the carrier" means delivery into the charge of the *actual* carrier because the drafters of the Montreal Convention

---

[6] Because neither party suggests that "contracting carriers" are limited to companies that own aircraft, we assume (without deciding) that the standard set forth in Article 39 can be applied according to its terms on a case-by-case basis based on the totality of the circumstances.

"declined to make material changes to the scope of 'carriage by air' in Article 18 and simply imposed concurrent liability on contracting carriers." Indemnity Br. at 22. We disagree. Article 40 plainly provides that when an actual carrier performs the whole or part of carriage, *both* the contracting carrier and the actual carrier are subject to the Montreal Convention – the actual carrier solely for the carriage it performs and the contracting carrier for "the whole of the carriage contemplated in the contract." Montreal Convention art. 40; *see also id.* art. 1(4). Thus, a contracting carrier, as defined by Article 39, is subject to the rules of the Montreal Convention, including Article 18. *See A.S.A.P. Logistics, Ltd. v. UPS Supply Chain Sols., Inc.*, 629 F. Supp. 3d 42, 46 n.3 (E.D.N.Y. 2022) (rejecting contention that the Montreal Convention applies only to actual carriers and holding that the "Montreal Convention clearly covers entities acting in the capacity of contracting carriers"); *Best*, 581 F. Supp. 2d at 363–64 ("Chapter 5 of the Montreal Convention, which includes Articles 39–41, extended liability to what it characterizes as 'contracting' carriers for harms incurred during carriage by 'actual' carriers."); *accord Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052, 1056–57 (11th Cir. 2009).

We likewise reject Unitrans's contention that carriage by air is a "term of art" applying to all damage occurring within the premises of the airport and that, therefore, the Montreal Convention applies here because the Cargo was damaged while it was at the airport. Unitrans Br. at 12, 14. The text of the Montreal Convention does not support the contention that *any* damage that occurs at an airport occurs during carriage by air, regardless of whether the cargo is in the charge of the carrier. As the Eleventh Circuit has explained, the Montreal Convention provides that a carrier is liable only for damage sustained during "carriage by air," which is "the period during which the cargo is in the charge of the carrier," except when the cargo is transported on the ground outside an airport. S*ee Underwriters at Lloyds*, 882 F.3d at 1040–42 (quoting Montreal Convention arts. 18(1), (3)–(4)). None of our precedent, even under the Warsaw Convention, is to the contrary. *See Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705, 706–08 (2d Cir. 1990) (holding that damage to cargo in the charge of a carrier that occurs *outside* of an airport does not occur during carriage by air, but not holding that all damage that occurs *inside* an airport occurs during carriage by air, regardless of whether the cargo is in the charge of the carrier); *Com. Union Ins. Co.*, 347 F.3d at 464–68 (holding that, under Article 18(4), when the point of damage is *unknown*,

15

carrier control over all portions of the journey is presumed, but not holding that, even if the point of damage is *known*, the cargo need not be in the charge of the carrier).  Here, there is no question that the Cargo was damaged inside the airport, but there remains the issue of whether the Cargo was damaged while "in the charge of the carrier."

## C.    Whether Unitrans Is a Contracting Carrier

There is no dispute that Unitrans was not the actual carrier because it did not perform and was not intending to perform any part of the carriage itself. Therefore, the Montreal Convention applies only if Unitrans was a contracting carrier under Articles 39 and 40.[7]

As discussed above and as relevant here, the Montreal Convention provides that a contracting carrier is a person that (1) as a principal (2) makes a contract of carriage governed by the Montreal Convention (3) with a consignor, and (4) an

---

[7] Indemnity contends that Unitrans has forfeited any argument that it acted as a contracting carrier because it never made that argument before the district court and failed to substantively address the issue in its brief on appeal.  *See* Reply at 10.  While it is well-established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]," *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (internal quotation marks omitted), we cannot say that Unitrans forfeited the argument here.  In both its summary judgment and appellate briefing, Unitrans addressed Indemnity's argument that the term "carrier" applies only to air carriers and asserted that, as noted by the district court, the drafters of the Montreal Convention included a chapter about the relationship between actual carriers and contracting carriers.  Dist. Ct. Doc. No. 21-1 at 16–17; Unitrans Br. at 8.

16

actual carrier performs the whole or part of the carriage by virtue of authority from the contracting carrier. *See* Montreal Convention art. 39. In general, a principal is "[s]omeone who authorizes another to act on his or her behalf as an agent" or "[s]omeone who has primary responsibility on an obligation." *Principal*, Black's Law Dictionary (11th ed. 2019).

Given the current factual record, we find that there remains a genuine dispute as to whether Unitrans was acting as a principal and, by extension, whether it qualifies as a contracting carrier. On the one hand, there is evidence indicating that Unitrans was acting as a principal because it took primary responsibility in making and executing the carriage contracts. Indeed, in Unitrans's interrogatory responses, it stated that it "acted as a freight forwarder and an indirect air carrier with regard to the Cargo," taking "responsib[ility] for the care[,] custody[,] and control of the Cargo" "[f]rom the receipt of the Cargo at the Amgen facility." J. App'x at 248; *see also, e.g.*, *id.* at 81 (Unitrans employee stating that "[a]ir waybill 037-49058936 was issued for the door[-]to[-]door carriage of the [C]argo on July 28, 2014"); *id.* at 225 (parties agreeing that Unitrans "entered into a contract with . . . Amgen . . . to transport [the Cargo] from Amgen's facility in Dun Laoghaire, Dublin, Ireland to Philadelphia, Pennsylvania"); *id.* at 268

17

(Amgen listing Unitrans as a "[c]arrier" in its internal invoices). A reasonable juror could take these statements to mean that Unitrans – acting as a principal with ultimate "responsibility" for the Cargo – made a contract with consignor Amgen to transport the Cargo internationally, and that Unitrans then subcontracted with US Airways. In this circumstance, Unitrans would have assumed the responsibility of a contracting carrier, while US Airways was set to perform the air carriage – as the "actual carrier" – by virtue of authority from Unitrans.

On the other hand, the record also contains evidence that paints Unitrans as an agent that merely set up an air-carriage contract between Amgen and US Airways. In this circumstance, Unitrans would not have been acting as a principal because it merely brokered the agreement while US Airways was obliged to perform the air carriage by virtue of its own authority. This view is supported by the fact that Unitrans presents itself as a "logistics company that arranges carriage of cargo on behalf of its customers," which suggests that it acts as an "intermediary" that merely makes travel arrangements in the manner of a travel agent. *Id.* at 63, 70. Indeed, Unitrans's own employees made similar representations, characterizing Unitrans not as a principal but as "an intermediary between the cargo shippers and the actual carriers." *Id.* at 70; *see also id.* at 76

18

(Unitrans employee stating that "Unitrans'[s] only involvement with the transportation is to make arrangements with other parties to carry the cargo" and that "Unitrans does not carry the cargo, Unitrans simply makes connections and moves paper").  Moreover, the single air waybill in the record conspicuously lists Amgen as the shipper, US Airways as the issuing and first carrier, and Unitrans's agent MCL as the agent of both Amgen and US Airways.  *See id.* at 112; *see also id.* at 226 (parties agreeing that the air waybill was "issued on behalf of the performing air carrier US Airways").[8]  That Unitrans is not mentioned in any active role further undercuts any claim to principal status.  Finally, the terms and conditions listed on the back of Unitrans's invoices state that Unitrans "assumes no liability as a carrier" unless it physically carries the cargo itself, *id.* at 88, which Unitrans did not do here, *see id.* at 81, 226–27, 273 (describing how MCL and TLC handled the carriage).

To be sure, none of these facts is dispositive.  Even if Unitrans characterized itself as only an intermediary, a bonafide contracting carrier surely cannot disclaim that status by its own fiat.  Nor is the single airway bill in the record conclusive, as

---

[8] The single air waybill here stands in stark contrast to the two air waybills described in *Commercial Union Insurance Co.* where the facts suggest that it would have involved a contracting carrier, if the terms of the Montreal Convention had then been applicable.  *See* 347 F.3d at 455–56.

19

it covers only the air carriage portion of the transport without indicating which entities assumed responsibility for the ground transport of the Cargo to and from the airports. *See id.* at 112 (referring to only one "carrier" – US Airways – and a flight from Dublin to Philadelphia without mentioning the ground carriers to and from the Dublin and Philadelphia airports).[9] But the point remains that there is enough evidence cutting both ways to create a genuine question as to whether Unitrans qualifies as a contracting carrier.[10] The district court therefore erred in granting summary judgment, and the case must be remanded for additional factfinding and trial if appropriate.

### III. CONCLUSION

For the reasons set forth above, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings.

---

[9] It remains unclear whether Unitrans (or MCL as its agent) ever issued a "house waybill" – which could further shed light on Unitrans's role and responsibilities – and if so, what happened to it. *See* J. App'x at 80 (explaining that an "air waybill" is the waybill issued by the actual carrier while the "house waybill" is issued by the forwarder).

[10] For the same reasons, we also reject Unitrans's alternative argument that it was entitled to summary judgment because it acted as an agent of US Airways when issuing the air waybill. *See* Montreal Convention art. 30(1) (providing that agents "shall be entitled to avail themselves of the conditions and limits of liability" of the Convention "if they prove that they acted within the scope of their employment"); *id.* art. 43 (stating that the Convention extends to agents of "the actual carrier" and of "the contracting carrier"). At present, there is not enough evidence in the record regarding US Airways's conduct for us, or the district court, to conclude that Unitrans was US Airways's agent. *See* Restatement (Third) of Agency § 2.01 (Mar. 2023 Update); *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012).